## BOARD OF TRADE OF THE CITY OF CHICAGO ET AL. v. OLSEN, UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF ILLINOIS, ET AL.

**APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.**

No. 701.   Argued February 26, 1923.—Decided April 16, 1923.

1. The decision of this Court in *Hill* v. *Wallace*, 259 U. S. 44, holding that local dealings on boards of trade in grain for future delivery, could not constitutionally be brought under federal control by means of the taxing power, as was attempted by the Future Trading Act, is not an authority against the Grain Futures Act of September 21, 1922, c. 369, 42 Stat. 998, which is an exercise of the power to regulate interstate commerce.   P. 31.
2. The flow of grain shipped into the Chicago market from other States, stored temporarily or held on cars, sold on the Chicago Board of Trade, and reshipped in large part to other States and foreign countries, is interstate commerce subject to regulation by Congress.   P. 33.
3. The fact that such grain is shipped under through bills of lading from western to eastern States giving shippers the right to remove the grain at Chicago for temporary purposes of storing, inspecting, weighing, grading, or mixing, and of changing ownership, consignee or destination, and then of continuing the shipment under the same contract at the same rate, while it does not prevent the local taxing of the grain while in Chicago, does not take it out of interstate commerce so as to deprive Congress of the power of regulation over it.   P. 33.   *Stafford* v. *Wallace*, 258 U. S. 495.

4. Neither does the fact that grain so shipped is temporarily stored in Chicago in warehouses and mixed with other grain, so that the owner receives other grain when presenting his receipt for continuing the shipment. P. 33. *Eureka Pipe Line Co.* v. *Hallanan,* 257 U. S. 265.

5. Sales on the exchange of the Chicago Board of Trade are indispensable to the continuity of this flow of grain in interstate commerce. P. 36.

6. Congress having reasonably found that sales of grain for future delivery (most of which transactions do not result in actual delivery but are settled by off-setting with like contracts), are susceptible to speculation, manipulation and control, affecting cash prices and consignments of grain in such wise as to cause a direct burden on and interference with interstate commerce therein, rendering regulation imperative for the protection of such commerce and the national public interest therein,—had power to provide in the Grain Futures Act, *supra,* for placing grain boards of trade under federal supervision and regulation as " contract markets," as a condition to dealing by their members in contracts for future delivery. P. 36.

7. The provision of the act requiring each board, so designated, to adopt a rule permitting the admission, as members, of authorized representatives of coöperative associations of producers engaged in the cash grain business, who comply, and agree to comply, with the rules of the board applicable to other members, and forbidding any rule to prevent the return of the commissions earned by such a representative, less expenses, for division among the members of his association on a *pro rata* patronage basis,—does not take the property of the members of the Chicago Board of Trade without due process of law. P. 40.

8. The Chicago Board of Trade is engaged in a business affected by a public national interest, and subject to national regulation as such. P. 40.

9. And Congress, therefore, may reasonably limit the rules governing its conduct to prevent abuses and secure freedom from undue discrimination in its operations, even if, incidentally, the value of memberships is decreased. P. 41.

10. The constitutionality of provisions of the above act forbidding use of the mails or interstate means of communication, to offer or accept sales for future delivery, except through members of boards of trade, is not here involved, since the plaintiffs are not affected by them, and, under § 10, invalidity of part of the act is not to affect the validity of the remainder. P. 42.

11. Section 9 of the act, declaring it to be a misdemeanor for a member of a board of trade, designated as a " contract market," to fail to evidence any contract mentioned in § 4 by a written record as therein required, is constitutional.   P. 42.

12. The constitutionality of the part of § 9 providing punishment for delivering through the mails, or interstate means of communication, false or misleading crop or market reports, is not involved in this case.   P. 42.

13. Neither is the constitutionality of paragraph (b) of § 6, giving the commission power to exclude from " contract markets " persons violating the act or attempting to manipulate the price of grain, in violation of § 5, or of any rule or regulation made in pursuance of its requirements.   P. 43.

Affirmed.

This is an appeal from a decree of the District Court for Northern Illinois, dismissing a bill in equity.  The appeal is under § 238 of the Judicial Code (as amended Act January 28, 1915, c. 22, 38 Stat. 803, 804), the case being one in which the constitutionality of the Grain Futures Act (enacted by Congress September 21, 1922, c. 369, 42 Stat. 998), is drawn in question.

The bill was brought by the Board of Trade of the City of Chicago, and a number of its members representing each class of traders on the exchange of the Board, to enjoin the United States District Attorney at Chicago, the Secretary of Agriculture, and the United States Postmaster at Chicago from taking steps to enforce the provisions of the act against them on the ground that it violates their rights under the Federal Constitution.

The purpose of the act is expressed in its title to be for the prevention of obstructions and burdens upon interstate commerce in grain by regulating transactions on grain future exchanges and for other purposes.  Its second section, par. (a), is one of definitions.  Its definition of interstate commerce, in the sense of the act, is as follows: " The words ' interstate commerce ' shall be construed to mean commerce between any State, Terri-

tory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through any place outside thereof, or within any Territory or possession, or the District of Columbia."

Paragraph (b) contains the following addition to the foregoing definition:

"(b) For the purposes of this Act (but not in any wise limiting the foregoing definition of interstate commerce) a transaction in respect to any article shall be considered to be in interstate commerce if such article is part of that current of commerce usual in the grain trade whereby grain and grain products and by-products thereof are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State, or for manufacture within the State and the shipment outside the State of the products resulting from such manufacture. Articles normally in such current of commerce shall not be considered out of such commerce through resort being had to any means or device intended to remove transactions in respect thereto from the provisions of this Act. For the purpose of this paragraph the word 'State' includes Territory, the District of Columbia, possession of the United States, and foreign nation."

Section 3 is in the nature of a recital and finding as follows:

" Sec. 3. Transactions in grain involving the sale thereof for future delivery as commonly conducted on boards of trade and known as ' futures ' are affected with a national public interest; that such transactions are carried on in large volume by the public generally and by persons engaged in the business of buying and selling grain and the products and by-products thereof in inter-

state commerce; that the prices involved in such transactions are generally quoted and disseminated throughout the United States and in foreign countries as a basis for determining the prices to the producer and the consumer of grain and the products and by-products thereof and to facilitate the movements thereof in interstate commerce; that such transactions are utilized by shippers, dealers, millers, and others engaged in handling grain and the products and by-products thereof in interstate commerce as a means of hedging themselves against possible loss through fluctuations in price; that the transactions and prices of grain on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling grain and products and by-products thereof in interstate commerce, and that such fluctuations in prices are an obstruction to and a burden upon interstate commerce in grain and the products and by-products thereof and render regulation imperative for the protection of such commerce and the national public interest therein."

The act in §4 forbids all persons to use mails or interstate telephone, telegraphic, wireless or other communication, in offering or accepting sales of grain for future delivery or to disseminate prices or quotations thereof, excepting the man who holds the grain he is offering for sale, and the owner or renter of land on which the grain offered for sale is to be grown; and excepting also members of boards of trade located at a terminal market on which cash sales occur in sufficient volume and under such conditions as to reflect the general value of grain and its different grades, and which have been designated by the Secretary of Agriculture as "contract markets."

The act puts these boards of trade under the supervision of the Secretary of Agriculture and imposes conditions

precedent and subsequent on his power to designate or continue them as " contract markets."

The conditions are:

(a) The keeping of a record with prescribed details of every transaction of cash and future sales of grain of the Board or its member in permanent form for three years, open to inspection of representatives of the Departments of Agriculture and of Justice.

(b) The prevention of the dissemination by the Board or any member of misleading prices.

(c) The prevention of manipulation of prices or the cornering of grain by the dealers or operators on the Board.

(d) The adoption of a rule permitting the admission as members of authorized representatives of lawfully formed coöperative associations of producers having adequate responsibility engaged in the cash grain business, complying with and agreeing to comply with, the rules of the Board applicable to other members, provided that no rule shall prevent the return to its members on a *pro rata* patronage basis the money collected by such association in the business, less expenses.

The Secretary of Agriculture, the Secretary of Commerce and the Attorney General are made a commission to hear and determine, after due notice, whether any board of trade has failed or is failing by rule to do the things required above, and, if found in default, to suspend its functions as a contract market for a period not to exceed six months, or to revoke its designation as such, with an appeal on the record to the Circuit Court of Appeals within the circuit where the board is situate. Such Commission, too, is to hear appeals from the Secretary's action in refusing to designate any board of trade as a contract market.

There is a further provision for excluding from all contract markets and trading privileges any person violating

the provisions of the act or the regulations in pursuance thereof.

Section 9 declares anyone trading in futures in violation of § 4 or sending intentionally or carelessly, false or misleading quotations or information as to the prices of grain, guilty of a misdemeanor.

The bill of the plaintiffs describes the organization of the Chicago Board of Trade as a corporation under a special act of the Legislature of Illinois, passed in 1859, with a membership of 1600 and a board of eighteen directors, of whom one is president. It avers that the Board does no business in selling or buying grain, but only furnishes an exchange and offices where such business can be done by its members; that it does not deliver any market quotation through interstate means, but it does cause to be collected the first price and each change of price on its exchange in cash and future sales during the regular hours in the exchange hall and delivers them to certain telegraph companies, who pay the Board for this information.

The bill further avers that it is sustained only by the initiation fees and dues of its members, the former being $25,000, for each member, and the latter being in the form of annual assessments, that it has from these sources accumulated funds with which to provide a large building and offices for the exchange, from some of which it receives rental and so has property worth two millions of dollars or more; that its existence depends on keeping its memberships valuable; that it does this by requiring character and financial responsibility as qualifications for its membership and by a requirement that a member shall charge for every sale a fixed minimum commission to a non-member principal, and a less minimum to a member who shall be his principal; that corporations are not permitted to be members, but that when two of the stockholders and officers are members, the corporation

is permitted as a member to make contracts on the exchange. The bill further avers that if the Board were required to admit representatives of coöperative associations of producers with the privilege of dividing with their members the proceeds of commissions less expenses, it would greatly impair the value of its memberships to other members.

The bill further avers that the members of its exchange engage only in three kinds of trading. (1) Many act as commission merchants and receive from producers and country grain dealers grain in cars and boats consigned to them which as agents they sell for immediate delivery and account to their principals for the proceeds of such sales less their commissions and other expenses, and many members as principals or agents purchase and sell grain in Chicago which is in cars or elevators for immediate delivery, and all of these transactions.are known as " cash trades."

(2) Many members send out in the afternoons whenever market conditions are·favorable, telegrams or letters to country grain dealers offering to buy grain, or to millers and other non-residents of Chicago, probable buyers, offering to sell grain at released prices and to be shipped within a certain time on condition that these offers be accepted before regular market hours the next morning. These are known as " cash sales for deferred shipment ", or as " sales to arrive."   ·

(3) Many of the members engage either as principals or agents in making on the exchange contracts with other members for the purchase and sale of grain for future delivery by which the seller agrees to deliver in Chicago the grain covered by the contract upon any day of the named month that he shall select. More than 75 per cent. of the volume of all trading in the exchange is for future delivery and under the rules it must be done in the exchange hall and between regular fixed hours; that both buyers

and sellers in all such contracts are personally present when the contracts are made.

The bill further avers that all contracts for future delivery are under the rules of the Board fulfilled only by delivery of warehouse receipts for the grain issued by twelve warehouses in Chicago, selected by the Board and having a capacity of 13 million bushels and licensed by the State of Illinois to do a public warehouse business; that the grain is mixed with other grain so that the receipt holder never gets the grain deposited when the receipt was issued; that while a rule of the exchange makes grain in railroad cars deliverable in future cars the last three days of the month, the transaction is not fully completed till the grain in those cars is deposited in a regular warehouse and receipt issued; that in the trading for future delivery more than three-quarters of the many millions of bushels contracted to be delivered are settled for without delivery by offsetting purchases; that a large part of the future trading is done by grain merchants, millers and others only for the purpose of insuring themselves against price fluctuations in respect of like grain owned by them and held for sale, shipment or manufacture and is settled by offsetting.

The bill further avers that another large part of future trading is done by speculators, so-called, who make a study of market conditions affecting prices, and try to profit by their judgment as to future prices; that few of such speculators have capital enough to make large single purchases in any way affecting the market; that six-sevenths of all the trading in futures in the country take place in Chicago; that no corners have been run on the exchange for fifteen years, due to the enforcement of rules against them by the Board and " perhaps to the Sherman Anti-Trust Act;" that manipulation has never been successfully resorted to to depress prices; that the selling of futures has no such effect; that the law of sup-

ply and demand regulates prices and prevents violent fluctuations, and that before hedging was made possible by this future trading the cost of the middleman between producer and consumer was much greater.

The defendants filed an answer admitting much of the bill but specifically denying the averments included in the last foregoing paragraph.

The plaintiffs submitted a large number of affidavits in support of a motion for a temporary injunction. These contained opinions of many professors of political economy in the colleges of the country to the effect that trading in futures in the long run did not depress prices, but stabilized them.

The court denied the motion for a temporary injunction and of its own motion dismissed the bill for want of equity.

The conclusions of Congress expressed in the recital of § 3 as to the detriment to interstate commerce from constantly recurring manipulation of sales for future delivery were reached after many years of investigation and examination of witnesses, including the advocates of regulation and those opposed, and men intimately advised in respect to the grain markets of the country.

The Senate Committee on Agriculture and Forestry reported to the Senate as follows:

" Every member of a grain exchange who testified before this committee acknowledged that there is at times excessive speculation and undesirable speculation in the futures market. Furthermore, it was brought out that a few big traders at times influence prices—manipulate the market—by the great volume of their operations. Also, it was shown that a continually fluctuating, and not a stable, market is the desire of speculators. Such a market is against the interests of the producer; he must have stable prices in order to market his crops to best advantage. A market without wide and frequent price fluctuations

would greatly benefit the producer. The reason for this is that rapidly fluctuating prices can not be fully reflected in the prices paid at country stations, so an additional margin must be allowed when buying in the country." Sen. Rep. No. 212, 67th Cong., 1st sess.

Witnesses testified before the Committee that a calculation based on commissions showed the total bushels of grain sold for future delivery on the Chicago Board of Trade in a year reach nearly twenty billions and that the amount of grain actually delivered under such contracts is not one per cent. of this. Objectors to future trading insisted at first that future trading put in the hands of desperate speculators an easy opportunity to corner the market and to promote great and rapid fluctuations in value and was wholly vicious and should be forbidden. Further investigation and consideration have satisfied many that the law of supply and demand operated on futures as on cash sales and that futures are very useful in certain respects; notably in offering a means by which through "hedging," owners of grain can, to some extent, protect themselves against the danger of losses by fluctuation.

The Government did not, in this hearing and argument, maintain that by manipulation the operators can permanently depress the prices of grain but cited the actual quotations from time to time, some as late as the summer of 1922, showing violent fluctuations through "deals" of large operators engaged in manipulating the futures market at intervals since 1900, before which corners were ever recurring but since which they have been infrequent. Much evidence was adduced before congressional committees that the sales of futures on the Chicago Board dominated the prices of wheat in this country and the world. The injurious effect of these recurring fluctuations in such futures upon the consignment of grain by owners and producers was asserted by witnesses. Mr.

Herbert Hoover, whose experience as Food Administrator gave his opinion weight, said to the House Committee on Agriculture (Future Trading Hearings—66th Cong. 3d sess., p. 909–910):

" The second form of manipulation and the one that I feel does at times take place, is the making of a drive on the price by either the sale or the purchase of such quantities as will affect the price by the volume of material coming to the market at that particular time. I would regard those transactions as an attempt to dislocate the normal flow of the law of supply and demand, and any attempt of any individual to dislocate a free market must be against public interest. I feel it is also against the interest of the individual producer, because a drive on the market that depresses the price must find a considerable number of farmers who, through the fall in price and their outstanding obligations, are compelled to liquidate, and they have been done an injury. Incidentally, the commodity has been brought into the market, and an acceleration to depression has been created."

Mr. Julius H. Barnes, the head of the United States Grain Corporation during the War, and of widest experience in the grain markets of the world, at the same hearing, after explaining that future dealing stabilizes prices and helps legitimate hedging and that a drive on prices worked its own cure in the long run, as did the distinguished economists whose affidavits were exhibited in this case, said (pp. 839–840):

" But it is also true that even though such a price depression must be temporary in character it may, during its period of effectiveness, do substantial injustice by forcing the liquidation of grain held on margins, or by the price tendency thus displayed frightening owners otherwise confident of the ultimate value of their goods."

The Federal Trade Commission in its report on wheat prices to the President, December 13, 1920, said, p. 8:

" Prices of wheat futures, the decline in which has been especially the subject of criticism, are susceptible of manipulation. Wide fluctuations in prices and large discounts of the future price below the cash price have prevailed. This has made it unsatisfactory for ' hedging,' and hedging sales may also appear to be manipulative, because, if they are large, they may cause sharp depressions. Wheat futures are not functioning well, even according to the standards of their advocates."

Mr. Julius H. Barnes, in his evidence before the Federal Trade Commission, in October, 1922, describes the effect upon interstate commerce of a " deal " in May, 1922, wheat on the Chicago Board of Trade, when the price of futures rose rapidly. Large operators collected cash wheat all over the country and headed it for Chicago for delivery at the attractive prices. This took wheat away from all the other wheat centers of the country where it normally would have remained for consumption and accumulated an almost unsalable quantity in Chicago, greatly disturbing the normal and useful flow of wheat in its ordinary and proper distribution and precipitating a crash in prices.[1]

---

[1] In response to Senate Resolution 133 the Federal Trade Commission prepared to make a report by conducting in October, 1922, an inquiry into the market manipulation of grain. Mr. Julius H. Barnes was a witness, and in the course of his examination said (pp. 74–76):

" Now, in May, 1922, we had the same spectacular gyrations in prices, starting earlier in the month and falling into a complete collapse in price. Why?

" COMMISSIONER MURDOCK: In the middle of the month this time?

" MR. BARNES: Yes, starting early in the month, rising to a peak and then falling to an early collapse. Without knowing the facts, because these things are detected by commission merchants, it seems quite clear that there were two or three large lines of wheat bought in Chicago for delivery in May 1922; that at least one of those, on popular report, was a man who could easily pay for five million bushels of wheat; that he intended to take the wheat as a merchant;

It was charged before the congressional committees that the limitation of deliveries under contracts for futures to warehouse receipts of twelve regular warehouses aggregating but thirteen million bushels capacity, with the privilege of a tender of grain in cars on the last three days of the delivery month and a power in the board of directors to enlarge the privilege in case of an emergency, casts another element of speculative doubt into the prices of futures and puts too much control in the board of directors. In view of the fact that the total capacity of Chicago for storing grain in public and private warehouses is forty-five millions, it is urged that this rule of the futures market is sinister and dangerous in affecting the prices of a market that are world-wide in their influence by such a narrow limitation of deliveries subject to

---

that he was going to pay cash for it and not squeeze somebody to make a settlement. He expected to get delivery of that, did not buy it in anticipation that it could not be delivered, and therefore he could force a settlement, and he was going to act as a merchant on the belief that wheat was worth more in the world's markets than the prices then ruling in Chicago; but on top of that there developed that two or three other men, who were evidently clear speculators, not acting with that conception, had also lines of wheat, and the aggregate of those made a shortage in Chicago exceeding the stock of wheat in Chicago or naturally tributary thereto.

" The result of that was that as this situation developed, the buyer, miller or exporter began to get afraid about the Chicago market, that he might have to buy his hedges in higher, and began to buy in those hedges and the market advanced under that kind of apprehensive buying, the buying of legitimate merchants who were frightened to leave their hedges in that month any longer. That helped make the peak, plus perhaps some buying by interested people who wanted to see the price marked up, and those large cash interests in Chicago began to collect all over the country wheat and head it to Chicago for delivery at these attractive prices, which by this time had reached a relation in respect to all of the markets which attracted wheat from every direction to Chicago.

" The result of that was that by the end of the month there was accumulated in Chicago a stock of ten or twelve million bushels of

arbitrary and uncertain change at the discretion of the Board, and that it is a factor in frightening shippers and lawful hedgers in making opportunity for speculative manipulation and burdening the flow of grain in normal interstate channels.[2]

wheat, which was beyond the normal absorbing capacity of the consumption trade that rests on Chicago, and that wheat had been lifted by the incentive of these apprehensively made prices from centers where it should have remained for the consumption which normally overtakes it from those centers—Omaha, Kansas City, Minneapolis, all these other points. So that the country stocks which should normally supply mills west of Chicago or south of Chicago were lifted out of their natural place and directed to Chicago by these apprehensively made prices, and there was collected in Chicago an almost unsalable quantity of wheat which could only press in one direction, could not go back.

"COMMISSIONER MURDOCK: So that we had a price collapse by that?"

See also letter of J. H. Barnes to Chicago Board of Trade, p. 69, Grain Futures Hearings before Committee on Agriculture and Forestry, U. S. Senate, 67th Cong., 2d sess., on H. R. 11843, containing the following:

"Present conditions lay an economic burden on distribution cost by drawing wheat to Chicago out of its accustomed channels and from points of supply needed shortly for actual consumption elsewhere. These evil effects are solely from apprehension of a forced settlement at artificial prices on hedges properly used as insurance against price level fluctuations."

[2]Evidence of Julius H. Barnes before Federal Trade Commission in October, 1922 (p. 77), on inquiry in response to Senate Res. No. 133:

"MR. BARNES: In the demonstration for several years that the chief abuses of the trade were deliberate manipulation and congestion, the deliberate forcing of settlement by artificial prices, the trade step by step tried to make it more difficult for anyone to obtain that control of the market. They made No. 1, 2, 3 wheat, and on all varieties deliverable. That was not sufficient, as demonstrated in Chicago two years ago to the Market Committee of 1917. I suggested to them that the trade ought to seriously consider a widening of the contract basis once more, so as to make wheat at Omaha and Kansas City and Minneapolis, at points of accumulation on the normal

*Mr. Henry S. Robbins* for appellants.

I. This case should be reversed with directions for a decree for appellants upon the authority of *Hill* v. *Wallace,* 259 U. S. 44.

The new act (§ 3) presents no reasons that were not before this Court on the former hearing. The provisions of the law, which are material here, are the same. The reasons of Congress for their enactment are the same, and in both cases are brought to the attention of this Court.

---

flow. So that there was not any substantial injustice done a buyer; deliverable at a freight cost difference and a small penalty, so that it would not be abused, and I stand to-day for that as being the one real constructive thing left for the Chicago market to-day, if Chicago is to be the liquid grain future trading market of America, as it should be, if there is a natural advantage in concentrating all the trading of the country in one market, so that you can send an order through and get one hundred thousand or five hundred thousand bushels in a minute, to answer a cable from abroad or a milling order, because the volume of trade there is liquid all the time, and I believe that is in the public interest.

"If it is to do that, then Chicago ought to widen this wedge against these shippers, and it can be done by taking into contract delivery the wheats in these other markets. The effect last May would have been that that wheat would have been delivered, but the wheat itself would have physically been in Omaha and Kansas City and available for milling in June and July, when it was needed, and it would not have been in Chicago to press direct on the east and the world's market and cause a further decline in price.

" Mr. WATKINS: Mr. Barnes, what you would include for delivery at Chicago markets you would include for delivery at Seaboard markets, would you not?

" Mr. BARNES: No, I would not, because as I say, on the natural flow, a buyer in Chicago for actual delivery of wheat must in the normal process of trade move that wheat east. His consumption both for export and milling is east of Chicago. Therefore, for him to take delivery west of Chicago at a freight difference and a small penalty is no substantial injustice; but to force him to take wheat at the Seaboard at the transportation cost when maybe he is buying in Chicago to supply a mill in Omaha, might be a very substantial injustice."

If there is a distinction broad enough to escape the effect of the former decision, it must lie in the fact that the reasons of Congress are now recited in the act, while in the former case this Court had them from the records of Congress. Such a distinction must rest either on the ground that the recitals in a statute of the reasons of Congress for passing it become conclusive upon the Court, when it is passing upon the constitutionality of the act, or that this Court can fully appraise the reasons of Congress only when they are incorporated into the act.

We do not stop to consider whether the technical doctrine of estoppel is here applicable; nor whether the doctrine of *stare decisis* is applicable to constitutional questions, because in any event *Hill* v. *Wallace* must, so far as applicable, control the decision of this case, unless this Court shall conclude—what we may not assume—that it made a mistake in that case, and should now recede from that decision.

II. Future trading on the exchanges does not impose a burden upon interstate commerce. The contrary of this proposition constitutes the key of the arch upon which this law rests. Without it the act clearly falls within the decision in *Hill* v. *Wallace.*

The recitals of § 3 are not conclusive of this question.

When the existence of constitutional power depends on a certain fact or condition, this Court must for itself determine whether that fact or condition really exists. *Matter of Jacobs,* 98 N. Y. 110; *Hairston* v. *Danville & Western Ry. Co.,* 208 U. S. 598, 606; *Hill* v. *Wallace, supra; Child Labor Tax Case,* 259 U. S. 20.

How then is the existence of this essential fact or condition to be ascertained—by the usual legal method of allegation and proof, or by such knowledge as this Court is presumed to have?

If the former, then upon this record such obstacle or burden to interstate commerce does not exist; for the bill

so alleges, and the case is here upon a demurrer to the bill sustained for want of equity.

But as after all this is a question of economic or trade law, which must be resolved more as a matter of expert opinion than by direct proof, it would seem to be a question which this Court could decide upon its own present knowledge of the subject, supplemented by such resort to the writings of trained minds as it shall find necessary.

Starting with the proposition that the price fluctuations under consideration are such as are created in sales for future delivery on an exchange, which " are not in and of themselves interstate commerce," such prejudicial effect, if any, as these fluctuations may have upon this future trading—which is purely intrastate commerce—or those participating in it, must be put to one side.

Our inquiry is to be confined to the effect of these future price fluctuations on such cash sales—including sales " of cash grain for deferred shipment or delivery "—as are interstate commerce.

We should here start with a clear conception that the prices in these future sales do not fix or determine the prices in cash sales in either intrastate or interstate commerce. The cash price and the future price in the same market will never—or at least only by a rare chance—be the same, except in the delivery month of the future contract when further trading for delivery in that month usually ceases except for the closing of existing contracts.

The cost of carrying the grain from the present time to the future delivery date constitutes one normal element of difference between the " cash " price and the price in the futures. So when the future sales contemplate delivery in a month of the next crop year the cash and future prices have no fixed relation to each other because dependent upon different supply conditions.

True, the cash prices will not continue below the level determined by a deduction from the future price equal

to the normal cost of carrying the actual grain until the delivery month; for whenever cash wheat thus falls speculators quickly take advantage of it by buying the cash and selling the future. But the cash price may be, and frequently is, relatively higher than the future price because of some urgent immediate demand of millers or exporters or other reason.

So too, there is nothing to compel those who make interstate sales or purchases of grain, to accept as their price the future price or any fixed departure from it. Two persons engage in a cash transaction in grain only when both minds agree upon what the price should be, and this occurs only when each is satisfied to join in a trade at that price. It is, in other words, a price voluntarily arrived at. What is true of an individual sale is equally true of all the sales which go to make up interstate commerce.

Doubtless the quotations of prices in future trading constitute a part, and often an important part, of the information upon which the minds of seller and buyer act in agreeing upon their price. But the shipper of grain across state lines will be more influenced by the prices of " cash " grain in his accessible markets, which are seldom actually, and often not relatively, the same as the future prices.

We must first ascertain the test or standard by which to determine whether these price fluctuations in intrastate commerce are a burden upon interstate commerce. Nothing may be regarded as a burden upon commerce, which does not prejudicially affect those engaged in it or the public generally. If this country exported all the grains that it raises, it might be said that whatever tends to raise the price is beneficial rather than hurtful, and only such conduct or influences as tended to depress prices should be regarded as a burden upon commerce. But this country consumes the major part of its own grains,

and this Court has determined in *United States* v. *Patten,* 226 U. S. 525, that a conspiracy of persons to run a " corner " and thereby increase prices is so harmful to the public as to be within the Sherman Anti-Trust Act.

Hence, what the law contemplates is the free and un- restricted play of the natural law of supply and demand. Only such conduct or influences, therefore, as cause prices in interstate commerce to be other than such as would result from this natural law, are to be here considered in ascertaining what are burdens upon that commerce.

This burden may arise, either because such prices are raised above, or depressed below, the normal price. The former could result—if at all—only from the excessive buying of speculators who aim to " corner " the markets and thereby force short sellers to settle at a price above the natural price. But " corners " in the grain market are " a thing of the past."

The question is thus reduced to, whether the fluctua- tions in this future trading are such as to abnormally depress the price of " cash " grain in interstate commerce to the prejudice of the producers.

The bill avers and the evidence in the *Christie Case,* 198 U. S. 236, showed that the grain buyers' profit in moving grain from the farmers to the foreign market— which formerly was from five to eight cents a bushel—had been reduced to not exceeding two cents a bushel by the opportunity afforded by future trading to the grain dealers to insure themselves against price fluctuations by the making of " hedging " contracts.

Theories respecting speculative trading in grain, which in the past have been deemed by legislators to be economic truths and been made the basis of restrictive legislation, are now conceded to be economic fallacies. No thoughtful person now contends that on economic grounds public in- jury results from speculation in grain, or that all future trading on the grain exchanges should be suppressed.

All that the proponents of this legislation now claim is that " sudden or unreasonable fluctuations in prices " in future trading " frequently occur as the result of speculation, manipulation or control," and that a depression of prices which results therefrom is " detrimental to the producers or consumers," and hence is a burden upon interstate commerce.

The short-seller's only motive is to profit by correctly forecasting the price, at which grain will sell at a future day. He is ever conscious that there are others at hand, who are actuated by a like motive to profit by buying, when the market price is such as to promise profit.

Before one can sell he must find some other member of the exchange who, or whose customer, takes a directly opposite view of the probable future price; the quantity bought equals the quantity sold. It is these conflicting views of many traders, which make the market. Thus future trading but expresses the attempts of all participants therein to profit by correctly forecasting the future price. Each is acting under the highest incentive to be right, because of the severe loss that will result from being wrong. They all know that the ultimate factor is the law of supply and demand, as affected by the market conditions when the delivery time arrives. Their sole aim is to correctly appraise the effect of such conditions upon the operation of that law.

The claim asserted in § 3 of the Grain Futures Act, that sudden or unreasonable fluctuations in prices frequently occur as the result of speculation, manipulation or control, in future trading, and constitute a burden upon interstate commerce, is negatived by the writings of economists and by the affidavits of twenty or more professors of political economy in our leading universities, which form part of this record.

Concurrence of view in the minds of those, who are best qualified to know, clearly establishes (1) that future

trading has not produced sudden or unreasonable fluctuations in prices; (2) that such fluctuations do not frequently occur as the result of speculation, manipulation or control; and (3) that such fluctuations as do occur in future trading are not detrimental to the producers or consumers, or a burden upon interstate commerce. Furthermore, there was nothing in the hearings before the committees of Congress preceding the passage of this and the former act to justify these recitals in § 3 of the act.

Whatever is intrastate in character must, in order to be a burden upon interstate commerce, (1) directly touch or affect such commerce, and (2) affect it in a substantially injurious way. In other words, it must be a direct and onerous burden upon such commerce. *Passenger Cases,* 7 How. 402; *Hopkins* v. *United States,* 171 U. S. 578; *Adair* v. *United States,* 208 U. S. 161; *Hooper* v. *California,* 155 U. S. 648; *Smith* v. *Maryland,* 18 How. 71; *Blumenstock Bros.* v. *Curtis Publishing Co.,* 252 U. S. 436; *Bradnax* v. *Missouri,* 219 U. S. 285; *Merchants Exchange* v. *Missouri,* 248 U. S. 365; *Field* v. *Barber Asphalt Co.,* 194 U. S. 618.

Does this intrastate future trading thus burden interstate commerce? Considered in its entirety, no one claims that it does. All concede that future trading is distinctly helpful to commerce.

All that is claimed by the proponents of this legislation is, that the *prices* made in this future trading at times prejudicially depress prices in interstate transactions in grain. It has already been shown that this is a false premise.

But assuming it to be a true one, can it be said that such intrastate prices so directly and materially affect interstate prices as to constitute a burden on interstate commerce? As we have already seen, interstate traders in grain are not obliged to accept, nor do in fact accept, these intrastate prices as the prices in their interstate

transactions. They constitute but a part of the information upon which such traders act in agreeing upon their prices. If Congress may justify interference with this purely intrastate trading upon the theory of protecting the normal play of the law of supply and demand as respects grain, it may upon the same grounds regulate the numerous exchanges where stocks, eggs, butter and other produce are dealt in, and whose prices are quoted in the daily press. Thus is presented the question, whether purely intrastate trading becomes subject to the commerce power of Congress merely because it frequently indirectly affects prices in interstate commerce. But there can be no distinction between intrastate *prices* and anything else of an intrastate character, which affects interstate prices. In other words, the question here is, whether every intrastate employment, business, or condition is within the commerce power of Congress, if it in any way affects prices in interstate commerce.

If so, then this Court was wrong in adjudging unconstitutional the first Child Labor Law. If the protection of prices in interstate commerce is to be held to justify the exercise of the interstate commerce power, that power will be enlarged far beyond any present conceptions of it. Wages of labor employed in manufacture and other elements of manufacture materially affect the prices of such manufactured products as subsequently enter into interstate commerce. Is the commerce power broad enough to regulate labor employed in, and other features of, manufacture? This Court in *United States* v. *Knight Co.,* 156 U. S. 1, 17, stated that combinations which raise or lower prices or wages in domestic enterprise only indirectly affect interstate commerce. See also *Railroad Co.* v. *Richmond,* 19 Wall. 584.

We do not here contend that Congress may not treat as an obstruction to commerce persons who combine for the purpose of directly fixing or affecting prices in interstate commerce (as in the *Addyston Pipe Case,* 175 U. S.

211; the *Swift Case,* 196 U. S. 375, and the *Patten Case,* 226 U. S. 525), but only that acts which may directly influence prices in intrastate trading in grain for future delivery can only indirectly affect, if at all, the interstate buying and selling of grain for immediate delivery; and that such acts are, therefore, beyond the commerce power of Congress.

III. The present act is not one to remove an alleged burden upon interstate commerce.

If the condition or subject-matter be partly of an interstate and partly of an intrastate character the commerce power will be judicially confined to that which is interstate. *Trade-Mark Cases,* 100 U. S. 82.

The only qualification to this principle is found where there is such an intermingling that that which is interstate cannot be protected or regulated without also touching that which is intrastate, *Minnesota Rate Cases,* 230 U. S. 354; *Houston, East & West Texas Ry. Co.* v. *United States,* 234 U. S. 342; and here the federal power is limited to the removal of the obstruction. *Illinois Central R. R. Co.* v. *Public Utilities Commission,* 243 U. S. 493.

Still another phase of the question is presented where the condition or subject matter is wholly within intrastate commerce, but it gives rise to certain incidents or opportunities, which enable evilly disposed persons so to act as to create an obstacle to or burden upon interstate commerce. The commerce power here should—if the spirit of the Constitution is not to be violated—be confined to measures directly aimed at the obstacle and those who create it. Congress may not use such obstacle as a pretext for absorbing complete control of such intrastate commerce in respect to things and persons in no way responsible for the supposed obstacle or burden. The present case falls within this last phase of the question.

Again Congress may not compel a trade agency created by a State and not itself participating in the offense—

as a condition of its continuing to participate in purely intrastate commerce—to actively assist the Nation in the enforcement of its laws—that is, become the police officer or the criminal court of the General Government.

The obstacle here claimed is overtrading which prejudices prices in interstate commerce in grain. The grain exchanges never trade at all: they merely maintain halls where others trade. The great majority of the members of exchanges are not guilty of overtrading.

The Grain Futures Act does not, in the section (9) which provides for the enforcement of the act through the criminal courts, include as an offense manipulation or overtrading. The act, however, does in fact, in § 6, make an attempt to manipulate a crime. When this is ascertained by the commission which the act creates, the offending person is punished by being deprived of the right to trade on any exchange—which may be his only vocation—and the exchange is required to coöperate in imposing this punishment, as a condition to the exercise of its right to conduct its purely intrastate business. Thus the exchange—which is not guilty of manipulation or overtrading—is punished by this law by being restricted in its right to pursue a lawful business.

The act is, therefore, not one to remove an obstruction to commerce, because it does not adopt the only appropriate means for doing so—a statute aimed at those who create the obstacle. See *United States* v. *Dewitt*, 9 Wall. 41, where this Court held that Congress could not prohibit the making of some oils in order to increase the production of others that it taxed.

IV. The removal of an obstruction to interstate commerce is a mere pretext, under which Congress seeks to regulate what is exclusively intrastate commerce.

V. The Grain Futures Act conflicts with the legislative discretion of the States respecting their intrastate commerce, and is in itself a burden upon that commerce.

VI. The act cannot be sustained under the power of Congress to establish post offices, or under its control of interstate communication by telegraph or telephone.

The purpose in this connection is not to exclude from such avenues of communication a message or letter or quotation that is false or obscene or fraudulent in itself or will promote fraud or other illegal conduct.

It is to compel the exchange to accept designation as a contract market by denying its members, if the exchange refuses so to qualify, the privilege of communicating with their customers through the mails or by interstate telegram or telephone. The prohibition is in the nature of a penalty. It is one of the enforcing provisions of the act. *Ex parte Jackson,* 96 U. S. 727; *In re Rapier,* 143 U. S. 110; *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288; *Burton* v. *United States,* 202 U. S. 344, 371; *Hoover* v. *McChesney,* 81 Fed. 472; *Western Union Tel. Co.* v. *Foster,* 247 U. S. 114; *Hammer* v. *Dagenhart,* 247 U. S. 251.

VII. The insurance feature.

Section 3 of the act recites that future contracts are utilized by shippers and dealers engaged in interstate commerce "as a means of hedging themselves against possible loss through fluctuations in price."

Section 4 of the act makes it unlawful for any person to make a contract of sale upon an exchange "which is or may be used for hedging any transactions in interstate commerce in grain," except it be made through a member of a "contract market."

These provisions seem to be based upon the theory that, because those who ship grain in interstate commerce resort to future trading to get insurance, future trading is thereby subject to the interstate commerce power.

But this Court has held that the business of insurance is not commerce, nor an instrumentality of commerce, but a mere incident thereto.

VIII. The provision of the act, § 5 (e), requiring exchanges to admit to membership representatives of cooperative associations of producers, and sanctioning " patronage dividends," deprives the Board of Trade and its members of their property without due process of law.

This identical provision was in the Future Trading Act, and was by this Court held to be not within the commerce power of Congress. The reasons alleged for reënacting some of the provisions of the former act, and which are thought to justify the new act, have no application to this particular provision. But this provision is also unconstitutional upon the further ground that it violates the due process provision of the Constitution.

It has never been held, even as respects modern common carriers, that any person could be legislated into a position where he might share with the owners the profits accruing from the use of their property in public service.

The power to impress property with a public use is, as respects a State, " an exercise of the police power of the State." *Budd* v. *New York,* 143 U. S. 545; *Lawton* v. *Steele,* 152 U. S. 133–137.

Congress may exercise such power only so far as it is included in the other powers conferred on it by the Constitution. *Hamilton* v. *Kentucky Distilleries,* 251 U. S. 146; *United States* v. *Cruikshank,* 92 U. S. 542; *Tennessee* v. *Davis,* 100 U. S. 257.

Again, this power, as respects any particular object, must reside exclusively either in the State or in Congress; it cannot well reside in both without producing conflicting statutes.

The property of this Board is situated in Illinois, the Board transacts no business upon its property, and the business that it permits its members to transact thereon is mostly of a domestic and local, as distinguished from an interstate, character; and it seems that the power to impress this property with a public use ought to belong to the State of Illinois alone.

Again, this section 5 (e) is in no sense a proper exercise
of the power. In all cases where the property involved is
privately owned, the only interest therein that a statute
may grant to the public (without paying for the prop-
erty) is the right of all to share in the service it renders
on fair and common terms.

This section is not for the benefit of the public gen-
erally, but only a certain class—farmers' organizations.

What the Grain Futures Act does is to force agents
of farmers' organizations into membership in the ex-
changes, so that all farmers who join coöperative asso-
ciations may escape the payment of the commissions—
which all others must pay—and thereby indirectly share
in the profit which accrues from the rendering of the
service—a profit which has resulted to the members of
the exchanges from the creation and maintenance for
many years (at private expense of money and effort) of
these instrumentalities of trade.

This instrumentality or privately owned property, and
the profit accruing from its use, like the grain elevator or
insurance company, and the profit therefrom, belong to
those who have created and own it.

Any statute which takes private property for a private
purpose—as well as one which takes property for a public
use without the payment of adequate consideration—
violates the due process clause of the Fifth or Fourteenth
Amendments to the Constitution. *Missouri Pacific Ry.
Co.* v. *Nebraska,* 164 U. S. 403; *Missouri, etc., Ry. Co.* v.
*Nebraska,* 217 U. S. 196; *Chicago, Mil. & St. P. Ry. Co.*
v. *Wisconsin,* 238 U. S. 491; *Eubank* v. *Richmond,* 226
U. S. 137; *Cole* v. *La Grange,* 113 U. S. 1.

The Fifth Amendment applies to an intangible right as
well as to tangible property. *Monongahela Co.* v. *United
States,* 148 U. S. 312, 343; *Oklahoma* v. *Kansas Natural
Gas Co.,* 221 U. S. 229, 253.

Again, any statute which materially impairs the value
or profitable use of private property is as much a taking

within the due process provision as the actual appropriation of it. *Peabody* v. *United States,* 231 U. S. 530; *Filor* v. *United States,* 9 Wall. 45, 49.

Indeed, a pecuniary loss need not be shown. If the right of property is invaded, the statute is within the constitutional provision. *Buchanan* v. *Warley,* 245 U. S. 60, 74.

IX. Section 6 of the act violates the due process of law provision of the Constitution.

This section provides that any person who " is violating any of the provisions of this Act, or is attempting to manipulate the market price of any grain in violation of the provisions of section 5 hereof, or of any of the rules or regulations made pursuant to its requirements," shall upon the complaint of the Secretary of Agriculture be tried before a commission consisting of such Secretary and two other cabinet officers (all of whom are appointed by, and hold office during the will of, the President), and if found guilty, the commission may punish him by depriving him of all trading privileges upon all " contract markets " " for such period as may be specified in said order," which may be permanently.

As speculating in grain and acting as agent for such speculators are recognized by the law to be lawful vocations, and as the right to pursue any lawful vocation—sometimes called " the liberty of pursuit "—is a part of the liberty which the Constitution guarantees to every citizen, it follows that the punishment here authorized is a deprivation of liberty within the meaning of that term in the due process clause.

Considering the offense created by, and the punishment provided therefor in, § 6, a trial by this commission appointed by the President, is not " due process of law." *Ex parte Milligan,* 4 Wall. 2; *Wong Wing* v. *United States,* 163 U. S. 228; *Huber* v. *Reily,* 53 Pa. St. 112; *Ex*

*parte Randolph,* Fed. Cas. No. 11,558; *Ong Chang Wing* v. *United States,* 218 U. S. 272; *Kilbourn* v. *Thompson,* 103 U. S. 168; *State* v. *Ryan,* 70 Wis. 676; *Parsons* v. *Russell,* 11 Mich. 113; *Addison* v. *State,* 126 Pac. 840; *Bessette* v. *Conkey Co.,* 194 U. S. 324.

Within authoritative definitions, attempts to manipulate, or other violation of the Grain Futures Act, clearly constitute crimes, which are punished solely in the interest of the general public. By depriving the violator of a part of his liberty it penalizes him for a wrong done to the public.

In this particular it is no less a criminal statute because, instead of compelling the wrong-doer to. pay a money penalty or sending him to jail, it deprives him of his constitutional right to earn a living by trading on an exchange.

Section 6 authorizes the commission to punish one " violating any of the provisions of the act." Section 9 of the act declares a like violation a misdemeanor and punishable by a fine not exceeding $10,000, or imprisonment not exceeding a year, or both. Section 9 contemplates a conviction in a criminal prosecution in the District Court. If violating any of the provisions of the act is a crime under § 9 it cannot be less so under § 6. By declaring in one section that the forbidden act is a misdemeanor and not doing so in another section, Congress cannot make the same act at once a crime and not a crime within the Constitution. *Schick.* v. *United States,* 195 U. S. 65; *Passavant* v. *United States,* 148 U. S. 214; *Origet* v. *Hedden,* 155 U. S. 228; *Oceanic Steam Nav. Co.* v. *Stranahan,* 214 U. S. 320; *Callan* v. *Wilson,* 127 U. S. 540; *Murray* v. *Hoboken Co.,* 18 How. 277; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81.

Section 6 also violates the Constitution in not. being confined to such attempts to manipulate as prejudicially affect interstate commerce.. *Trade-Mark Cases,* 100 U. S. 82.

It is hardly conceivable that the Constitution, in conferring interstate commerce power on Congress, intended to authorize it to exact licenses from every person engaged in making intrastate contracts for future delivery and make them revocable by an executive officer as a means of preventing some from obstructing interstate commerce.

It is therefore submitted that § 6 of the act, so far as it confers on this commission jurisdiction to try persons for overtrading, and to punish them by depriving them of the right to resort to the exchanges, is unconstitutional.

This question directly arises on this appeal; for the suit is not merely one by the Board of Trade, but also by seven members of the Board (suing on behalf of all of them) to restrain a public official (the Secretary of Agriculture) from enforcing, as prosecutor, what is a criminal provision—it being, as the bill alleges, his purpose to enforce it.

*Mr. Solicitor General Beck,* with whom *Mr. Blackburn Esterline,* Assistant to the Solicitor General, *Mr. R. W. Williams* and *Mr. Fred Lees* were on the brief, for appellees.

MR. CHIEF JUSTICE TAFT, after stating the case as above, delivered the opinion of the Court.

Appellants contend that the decision of this Court in *Hill* v. *Wallace,* 259 U. S. 44, is conclusive against the constitutionality of the Grain Futures Act. Indeed in their bill they pleaded the judgment in that case as *res judicata* in this, as to its invalidity. The act whose constitutionality was in question in *Hill* v. *Wallace* was the Future Trading Act (c. 86, 42 Stat. 187). It was an effort by Congress, through taxing at a prohibitive rate sales of grain for future delivery, to regulate such sales on boards of trade by exempting them from the tax if they would comply with the congressional regulations. It was

held that sales for future delivery where the parties were present in Chicago, to be settled by offsetting purchases or by delivery, to take place there, were not interstate commerce and that Congress could not use its taxing power in this indirect way to regulate business not within federal control. We said (p. 68):

"Looked at in this aspect and without any limitation of the application of the tax to interstate commerce, or to that which the Congress may deem from evidence before it to be an obstruction to interstate commerce, we do not find it possible to sustain the validity of the regulations as they are set forth in this act. A reading of the act makes it quite clear that Congress sought to use the taxing power to give validity to the act. It did not have the exercise of its power under the commerce clause in mind and so did not introduce into the act the limitations which certainly would accompany and mark an exercise of the power under the latter clause."

Again, on page 69, we said:

" It follows that sales for future delivery on the Board of Trade are not in and of themselves interstate commerce. They can not come within the regulatory power of Congress as such, unless they are regarded by Congress, from the evidence before it, as directly interfering with interstate commerce so as to be an obstruction or a burden thereon."

The Grain Futures Act which is now before us differs from the Future Trading Act in having the very features the absence of which we held in the somewhat carefully framed language of the foregoing quotations prevented our sustaining the Future Trading Act. As we have seen in the statement of the case, the act only purports to regulate interstate commerce and sales of grain for future delivery on boards of trade because it finds that by manipulation they have become a constantly recurring burden and obstruction to that commerce. Instead,

therefore, of being an authority against the validity of the Grain Futures Act, it is an authority in its favor.

The Chicago Board of Trade is the greatest grain market in the world. *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 235. Its report for 1922 shows that on that market in that year were made cash sales for some three hundred and fifty millions of bushels of grain, most of which was shipped from States west and north of Illinois into Chicago, and was either stored temporarily in Chicago or was retained in cars and after sale was shipped in large part to eastern States and foreign countries. This great annual flow is made up of the cash grain sold on the exchange, the cash sales to arrive (*Chicago Board of Trade* v. *United States,* 246 U. S. 231), and the comparatively small percentage of grain contracted to be sold in the futures market not settled by offsetting. *Chicago Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 248. The railroads of the country accommodate themselves to the interstate function of the Chicago market by giving shippers from western States bills of lading through Chicago to points in eastern States with the right to remove the grain at Chicago for temporary purposes of storing, inspecting, weighing, grading, or mixing, and changing the ownership, consignee or destination and then to continue the shipment under the same contract and at a through rate. *Bacon* v. *Illinois,* 227 U. S. 504. Such a contract does not prevent the local taxing of the grain while in Chicago; but it does not take it out of interstate commerce in such a way as to deprive Congress of the power to regulate it, as is plainly intimated in the authority cited (p. 516) and expressly recognized in *Stafford* v. *Wallace,* 258 U. S. 495, 525, 526. The fact that the grain shipped from the west and taken from the cars may have been stored in warehouses and mixed with other grain, so that the owner receives other grain when presenting his receipt for con-

tinuing the shipment, does not take away from the inter-
state character of the through shipment any more than a
mixture of the oil or gas in the pipe lines of the oil and
gas companies in West Virginia, with the right in the
owners to withdraw their shares before crossing state
lines, prevented the great bulk of the oil and gas which
did thereafter cross state lines from being a stream or
current of interstate commerce. *Eureka Pipe Line Co.*
v. *Hallanan,* 257 U. S. 265, 272; *United Fuel Gas Co.* v.
*Hallanan,* 257 U. S. 277, 281.

It is impossible to distinguish the case at bar, so far as
it concerns the cash grain, the sales to arrive, and the
grain actually delivered in fulfillment of future contracts,
from the current of stock shipments declared to be inter-
state commerce in *Stafford* v. *Wallace,* 258 U. S. 495.
That case presented the question whether sales and pur-
chases of cattle made in Chicago at the stockyards by
commission men and dealers and traders under the rules
of the stockyards corporation could be brought by Con-
gress under the supervision of the Secretary of Agricul-
ture to prevent abuses of the commission men and deal-
ers in exorbitant charges and other ways, and in their
relations with packers prone to monopolize trade and de-
press and increase prices thereby. It was held that this
could be done even though the sales and purchases by
commission men and by dealers were in and of themselves
intrastate commerce, the parties to sales and purchases
and the cattle all being at the time within the city of
Chicago.

We said (pp. 515, 516):

" The stockyards are not a place of rest or final desti-
nation. Thousands of head of live stock arrive daily by
carload and trainload lots, and must be promptly 'sold
and disposed of and moved out to give place to the con-
stantly flowing traffic that presses behind. The stock-
yards are but a throat through which the current flows,

and the transactions which occur therein are only incident to this current from the West to the East, and from one State to another. Such transactions can not be separated from the movement to which they contribute and necessarily take on its character. The commission men are essential in making the sales without which the flow of the current would be obstructed, and this, whether they are made to packers or dealers. The dealers are essential to the sales to the stock farmers and feeders. The sales are not in this aspect merely local transactions. They create a local change of title, it is true, but they do not stop the flow; they merely change the private interests in the subject of the current, not interfering with, but, on the contrary, being indispensable to its continuity. The origin of the live stock is in the West, its ultimate destination known to, and intended by, all engaged in the business is in the Middle West and East either as meat products or stock for feeding and fattening. This is the definite and well-understood course of business. The stockyards and the sales are necessary factors in the middle of this current of commerce."

This case was but the necessary consequence of the conclusions reached in the case of *Swift & Co.* v. *United States,* 196 U. S. 375. That case was a milestone in the interpretation of the commerce clause of the Constitution. It recognized the great changes and development in the business of this vast country and drew again the dividing line between interstate and intrastate commerce where the Constitution intended it to be. It refused to permit local incidents of great interstate movement, which taken alone were intrastate, to characterize the movement as such. The *Swift Case* merely fitted the commerce clause to the real and practical essence of modern business growth. It applies to the case before us just as it did in *Stafford* v. *Wallace.*

The distinction that the exchange of the Chicago Board of Trade building is not within the same enclosure as the

railroad yards and warehouses in which the grain is received and stored on its way from the West to the East as it is being sold on the exchange, while the stockyards exchange and the actual receipt and shipment of cattle are within the same fence, surely can make no difference in the application of the principle. The sales on the Chicago Board of Trade are just as indispensable to the continuity of the flow of wheat from the West to the mills and distributing points of the East and Europe, as are the Chicago sales of cattle to the flow of stock toward the feeding places and slaughter and packing houses of the East.

The question under this act is somewhat different in form and detail from that in the *Stafford Case,* but the result must be the same. It is not the sales and deliveries of the actual grain which are the chief subject of the supervision of federal agency by Congress in the Grain Futures Act although a record of cash sales is required and a corner in cash sales would be a violation of it, and there are other provisions equally regulatory of them. It is the contracts of sales of grain for future delivery, most of which do not result in actual delivery but are settled by offsetting them with other contracts of the same kind, or by what is called " ringing." *Chicago Board of Trade* v. *Christie Grain & Stock Co.,* 198 U. S. 236, 246–247. The question is whether the conduct of such sales is subject to constantly recurring abuses which are a burden and obstruction to interstate commerce in grain? And further, are they such an incident of that commerce and so intermingled with it that the burden and obstruction caused therein by them can be said to be direct?.

In *United States* v. *Ferger,* 250 U. S. 199, the question was of the validity of a statute of Congress punishing the forging of bills of lading used in interstate commerce, and altering them. The lower court had dismissed an indictment charging the offense denounced in the statute,

on the ground that Congress could only deal with real bills of lading where there was an actual shipment in interstate commerce and had no power to punish a fraud and fiction where there was no such commerce, and where the bills of lading whose fabrication was the subject of complaint were mere pieces of paper fraudulently inscribed, and did not relate to any actual interstate commerce. This Court, speaking through Chief Justice White, rejected the view of the lower court, on the ground that interstate commerce would be directly impaired and weakened by the unrestrained right to fabricate and circulate spurious bills of lading apparently connected with such commerce. The Court, in *Stafford* v. *Wallace, supra,* adopted and applied this principle and said, 258 U. S. 521:

" Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and meet it. This court will certainly not substitute its judgment for that of Congress in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly non-existent."

In the act we are considering, Congress has expressly declared that transactions and prices of grain in dealing in futures are susceptible to speculation, manipulation and control which are detrimental to the producer and consumer and persons handling grain in interstate commerce and render regulation imperative for the protection of such commerce and the national public interest therein.

It is clear from the citations, in the statement of the case, of evidence before committees of investigation as to manipulations of the futures market and their effect, that we would be unwarranted in rejecting the finding

of Congress as 'unreasonable, and that in our inquiry as to the validity of this legislation we must accept the view that such manipulation does work to the detriment of producers, consumers, shippers and legitimate dealers in interstate commerce in grain and that it is a real abuse.

But it is contended that it is too remote in its effect on interstate commerce, and that it is not like the direct additions to the cost of the producer of marketing cattle by exorbitant charges and discrimination of commission men and dealers, as in *Stafford* v. *Wallace*. It is said there is no relation between prices on the futures market and in the cash sales. This is hardly consistent with the affidavits the plaintiffs present from the leading economists, already referred to, who say that dealing in futures stabilizes cash prices. It is true that the curves of prices in the futures and in the cash sales are not parallel and that sometimes one is higher and sometimes the other. This is to be expected because futures prices are dependent normally on judgment of the parties as to the future, and the cash prices depend on present conditions, but it is very reasonable to suppose that the one influences the other as the time of actual delivery of the futures approaches, when the prospect of heavy actual transactions at a certain fixed price must have a direct effect upon the cash prices in unfettered sales. The effect of such a " deal" as that of May, 1922, as explained by Mr. J. H. Barnes, shows this clearly and illustrates in a striking way the direct effect of such manipulation in disturbing the actual normal flow of grain in interstate commerce most injuriously. Mr. Barnes also points out the effect of the operation of the rule limiting deliveries to warehouse receipts from warehouses selected by the directors of the Board whose unregulated power to suspend or modify the rule pending settlement, adds to the speculative character of the market and frightens consignors.

More than this, prices of grain futures are those upon which an owner and intending seller of cash grain is influenced to sell or not to sell as they offer a good opportunity to him to hedge comfortably against future fluctuations. Manipulations of grain futures for speculative profit, though not carried to the extent of a corner or complete monopoly, exert a vicious influence and produce abnormal and disturbing temporary fluctuations of prices that are not responsive to actual supply and demand and discourage not only this justifiable hedging but disturb the normal flow of actual consignments. A futures market lends itself to such manipulation much more readily than a cash market.

In the case of *United States* v. *Patten,* 226 U. S. 525, an indictment charged a conspiracy to run a corner by making purchases of quantities of cotton for future delivery, by means of which the conspirators were to secure control of the available supply of cotton in the country and enhance the price of cotton at will. It was contended that even if the necessary result of this was an obstruction of interstate trade, it was so indirect as not to constitute a restraint of it within the Federal Anti-Trust Law under which the indictment was drawn. This Court held otherwise and sustained the indictment.

Corners in grain through trading in futures have not been so frequent as they were before 1900, due, as the plaintiffs aver, to the stricter rules of the Board of Trade as to futures and to the Sherman Anti-Trust Act, though they do seem to have since occurred infrequently. The fact that a corner in grain is brought about by trading in futures shows the direct relation between cash prices and actual commerce on the one hand, and dealing in futures on the other, because a corner is not a monopoly of contracts only, it is a monopoly of the actual supply of grain in commerce. It was this direct relation that led to the decision in the *Patten Case.* If a corner and the enhance-

ment of prices produced by buying futures directly burden interstate commerce in the article whose price is·enhanced, it would seem to follow that manipulations of futures which unduly depress prices of grain in interstate commerce and directly influence consignment in that commerce are equally direct. The question of price dominates trade between the States. Sales of an article which affect the country-wide price of the article directly affect the country-wide commerce in it. By reason and authority, therefore, in determining the validity of this act, we are prevented from questioning the conclusion of Congress that manipulation of the market for futures on the Chicago Board of Trade may, and from time to time does, directly burden and obstruct commerce between the States in grain, and that it recurs and is a constantly possible danger. For this reason, Congress has the power to provide the appropriate means adopted in this act by which this abuse may be restrained and avoided.

The next provision of the act which is attacked as invalid is that which forbids a board, designated as a contract market, from excluding from membership in, and all privileges on, its exchanges any duly authorized representative of a lawfully formed and conducted association of producers having adequate financial responsibility, engaged in the cash grain business, and complying or agreeing to comply with the terms and conditions lawfully imposed on the other members, and which bars any rule forbidding the return by such association of the commissions of its representative, less expenses, to the *bona fide* members of the coöperative association in proportion to their consignments of grain to the exchange. It is said that this will impair the value of membership in the Board and will take the property of the members without due process of law.

The Board of Trade conducts a business which is affected with a public interest and is, therefore, subject to

reasonable regulation in the public interest. The Supreme Court of Illinois has so decided in respect to its publication of market quotations. *New York & Chicago Grain Exchange* v. *Chicago Board of Trade,* 127 Ill. 153. In view of the actual interstate dealings in cash sales of grain on the exchange, and the effect of the conduct of the sales of futures upon interstate commerce, we find no difficulty under *Munn* v. *Illinois,* 94 U. S. 113, 133, and *Stafford* v. *Wallace, supra,* in concluding that the Chicago Board of Trade is engaged in a business affected with a public national interest and is subject to national regulation as such. Congress may, therefore, reasonably limit the rules governing its conduct with a view to preventing abuses and securing freedom from undue discrimination in its operations. The incidental effect which such reasonable rules may have, if any, in lowering the value of memberships does not constitute a taking, but is only a reasonable regulation in the exercise of the police power of the National Government. Congress evidently deems it helpful in the preservation of the vital function which such a board of trade exercises in interstate commerce in grain that producers and shippers should be given an opportunity to take part in the transactions in this world market through a chosen representative. Nor do we see why the requirement that the relation between them and this representative, looking to economy of participation on their part by a return of patronage dividends, should not be permissible because facilitating closer participation by the great body of producers in transactions of the Board which are of vital importance to them. It would seem to make for more careful supervision of those transactions in the national public interest in the free flow of interstate commerce. Under the present rules of the Board, corporations are permitted to enjoy the benefit of membership by reason of the membership of two of their executive officers who are *bona fide* stockholders, and all their stock-

holders are thus given a chance to enjoy the commissions earned and the benefits to the corporation of other membership privileges to the extent of their stock ownership. The provisions of the act objected to are to be sustained on the principles laid down in *House* v. *Mayes,* 219 U. S. 270; *Brodnax* v. *Missouri,* 219 U. S. 285, and *Grisim* v. *South St. Paul Live Stock Exchange,* 152 Minn. 271. We think the objection to this feature of the act untenable.

We do not find it necessary to our decree in this case to consider the constitutional objections made in the bill to that part of the fourth section which forbids the use ·of the mails and interstate facilities of communication ·to offer or accept sales for future deliveries or to send quotations of prices thereof except through members of a board of trade, because the plaintiffs are not affected thereby. Section 10 of the act reads as follows:

" If any provision of this Act or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby."

The unconstitutionality of these provisions, if they be unconstitutional, would, therefore, not invalidate the rest of the act.

Section 9 declares it to be a misdemeanor for a member of a designated board of trade to fail to evidence any contract mentioned in § 4 by a record. in writing as therein required. This is only a legitimate means of enforcing the statutory regulations of the Board of Trade which we have found to be within the power of Congress.

As to the power of Congress to provide in § 9 for the punishment of any one who shall knowingly or carelessly deliver through the mail or interstate means of communication false or misleading crop or market reports, it will be time enough for us to consider its existence when some one is charged with the offense and is brought to trial therefor. The plaintiffs present no such case.

Paragraph (b) of § 6 which gives to the Commission the power, on complaint after investigation by the Secretary of Agriculture, and after a hearing, to exclude from all contract markets any person violating any of the provisions of the act or attempting to manipulate the market price of any grain in violation of the provisions of § 5 of the act or of any of the rules or regulations made in pursuance to its requirements, is attacked as invalid because a jury trial is not afforded. The plaintiffs do not aver that they are committing acts which will subject them to such exclusion, or that charges have been made and proceedings have been begun or are about to be begun against them by the Secretary of Agriculture. Until they are thus in danger of suffering prejudice from the operation of the paragraph, they can not invoke our decision as to its validity.

For the reasons given the decree of the District Court is

*Affirmed.*

MR. JUSTICE McREYNOLDS and MR. JUSTICE SUTHERLAND dissent.