## TAGG BROS. & MOORHEAD et al. v. UNITED STATES et al.

District Court, D. Nebraska, Omaha Division. December 18, 1928.

No. 847.

Francis A. Brogan, Alfred G. Ellick, and Anan Raymond, all of Omaha, Neb. (James M. Beck, of Washington, D. C., of counsel), for plaintiffs.

William J. Donovan, Asst. Atty. Gen., H. B. Teegarden, Sp. Asst. Atty. Gen., and James C. Kinsler, U. S. Atty., of Omaha, Neb., for defendants.

Before LEWIS, Circuit Judge, and WOODROUGH and SCOTT, District Judges.

WOODROUGH, District Judge. Plaintiffs, constituting market agencies engaged in the buying and selling of live stock on commission at the Union Stockyards at Omaha, Neb., bring this suit against defendants to enjoin the enforcement of an order of November 19, 1926, made by defendant William M. Jardine, as Secretary of Agriculture of the United States, under what is known as the Packers and Stockyards Act of August 15, 1921 (chapter 64, 42 Stat. 159; U. S. C. 1925, title 7, chapter 9 [7 USCA §§ 181–229]), which said order of November 19, 1926, suspended the tariff of rates theretofore in effect at the Union Stockyards at Omaha, Neb., for the buying and selling of live stock on commission, by market agencies on said market, and prescribed, in lieu thereof, a new schedule, effective January 1, 1927, fixing the maximum commission rates chargeable for the purchase and sale of live stock by such market agencies.

The three original plaintiffs are a corporation, an individual, and a copartnership, respectively suing on their own behalf and on behalf of all others similarly situated. Later other market agencies doing the same kind of business at the same place filed their petition of additional parties in the same case. Plaintiffs say that the act is void so far as it empowers the Secretary to fix rates for the service of the market agencies, that the language of the act does not purport to give the Secretary any power to enforce his rate schedules with penalties, and that the rates which he has fixed are noncompensatory and confiscatory.

There is no doubt that the market agencies at the South Omaha yards are engaged in interstate commerce and are therefore subject to lawful supervision by the federal authority, because, in the commission men's suit to settle that question, the Supreme Court squarely decided that they were. Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229. I think that the issues in the Stafford Case presented for the court's consideration the question of the Secretary's power to fix the rates of the market agencies, and that the language used in the opinion and the later opinion—Board of Trade v. Olsen, 262 U. S. 1, 34, 43 S. Ct. 470, 67 L. Ed. 839—indicates a conclusion reached by the Supreme Court in favor of the existence of the power of the Secretary. However, as the Supreme Court did not directly discuss the question, it may be treated as open for decision in this case.

The plaintiffs say that there is no power to fix their rates and charges, because their work is really like that of wageworkers or men who hire out their energies, skill, and brains in the service of others in a personal way, and that it would deprive them without due process of their liberty, and their property right to bargain for their work, if the government should impose rates upon them. The use of capital plays very little part in the performance of their function by the market agencies. As the Secretary says in the order complained of, "The value of property used is relatively small," and the master in his report notes that a former practice of making advances to customers is being discontinued, tending further to lessen the use of capital. In the argument of the case from another and alternative angle, the use of capital in the business and the matter of returns upon it, depreciation, et cetera, are stressed; but here the commission men picture themselves as men who go upon the market with their skill developed in a highly specialized vocation, and there work for such customers as choose to hire them in strenuous and open competition with all others similarly engaged. They contend they ought to be as free to bargain for the price of their work as any other workmen, and that to take away the right is to deprive them of liberty. They might concede the power of Congress to limit by regulation the rates they may get upon their invested capital used in the business, but that is a secondary matter. The total compensation of all the market agencies amounts to less than 1 per cent. of the value of the stuff they handle; most of it is pay for skilled services, and the main purpose and effect of the Secretary's order is to reduce that pay.

For many years the agencies have operat-

ed under a schedule of rates fixed by their Omaha exchange and undoubtedly the fact that the rates are so fixed by an organization of which the commission men and traders are members, and their customers, the live stock owners and shippers, are not, inclines public authority to take a hand in the matter. The Secretary of Agriculture says in his order now under attack in this case: "If the owners of the 58 firms or corporations composing the respondents can through a committee, or whatever other machinery they see fit to adopt, arrive at the rates to be charged the shipper a disinterested governmental agency can fairly arrive at such rates."

There does seem to be an incongruity between the fact that the commission men operate under uniform, fixed rates, and yet make the claim that the sovereign power cannot require that the rates be reasonable. But it is said railroad employees work directly in interstate commerce, and the individuals have long since surrendered to their unions their natural right to fix their wages, still only great emergency would justify fixing a standard, even temporarily. So, notwithstanding their rates fixed by their stock exchange, these plaintiffs still insist that they are in a like case with workers in the handicrafts or professions generally, and immune from rate fixing.

The master, after study of all the authorities, thinks that the plaintiffs are right, and that the Secretary's rate-fixing order is void. He cites many expressions in the opinions of the courts which, standing alone, would appear to sustain him. But we do not agree. We are not persuaded that it is within the power of the plaintiffs to combine and agree among themselves upon commissions that would be exorbitant enough to destroy the market and the interstate commerce, and yet remain beyond the reach of federal regulation. We are satisfied that Congress has full power to regulate this commerce in the basic food supply of the nation throughout the long channel through which it flows. At the one spot of greatest concentration, in the few hours when the commission men have all of the stuff of the commerce in their own hands, the commerce cannot be and is not beyond the pale. If a course of reasoning leads to that end, there is a flaw in it.

The evidence convinces us that the services of the market agencies to which the Secretary's rate attaches are the services of a business, and that the business is affected with the public use. The public use is clearly shown by the circumstances under which the business is carried on. If the public stockyards company itself performed the marketing function in its yards, there would certainly be no question of the public use. There would be obvious the use of the public utilities, the immediate pressing necessary character of the service, the situation which imposes an obligation to serve all comers and all alike, the disparate position of those who have the property in their hands and control with power to sell, and those who own it and all of the incidents, to justify governmental prevention of extortion and regulation of rates. The gist of the business is no different because the public stockyards company assigns and turns over the use of its public facilities to the marketing agencies for the performance of their function, and lets them carry on the marketing in the yards. The public use and incidental obligations are all present.

Plaintiffs' arguments to the effect that the Secretary cannot measure rate of return for brain power, or fix a per cent. on the sweat of the brow, or reconcile the power to regulate and the right of the individual to be free from any confiscation of his liberties, are interesting—possibly embarrassing. But regulation is the daughter of necessity. When open competition is lacking, and monopolistic combination would fix its own rate, necessity arises. Inanimate property of itself neither serves nor produces, without human brain and sweat to guide and drive. So in all regulation there is involved the regulation of the services of man.

The flow of this commerce through the stockyards may be likened to the course of travel across a toll bridge, and there is an analogy if you picture such a bridge equipped with a toll gate at both its ends. When the travelers go upon the bridge, the bridge owner lifts the toll bar and collects the tolls; but when they come to the other end there is a group of men who have an arrangement with the bridge owner to lift the other toll bar for a price. Would it not be absurd to say that the bridge owner's prices may be regulated, but that the others can get together and charge anything they please—that the travelers may be protected from extortion in getting onto the bridge, but not when they come to getting off? Certainly, if the bridge owner's business is affected with a public use, the business of those who control the means of getting off the bridge is so a fortiori.

Nobody imagines that the stockyards company does not get compensation for use of its very costly facilities and its services. It

exacts its toll as the commerce goes through. It makes a charge for hay and the like. The commerce cannot go through, however, until the plaintiffs perform their function, any more than the traveler can get over the bridge until the last bar is lifted. If plaintiffs' function, then, is beyond regulation, all the rest of the regulation might become futile. We find no such impotency in the government.

It does not appear that any one of the numerous regulation cases which cause sharp division in the Supreme Court is exactly analogous to this. None of the cases where power to fix rates is denied present a business so plainly affected with public use, consisting so largely of personal service. We do not find any declaration by the Supreme Court that a business consisting mostly of personal services may not become affected with a public use, or that there is no public right of self-defense against extortion merely because personal services rather than property uses furnish the excuse. In the cases where legislative attempts to regulate wages were frustrated, the persons to be regulated had not gotten themselves in such a position towards their public that the public ought to be held to have a right in regard to the business—the right to be dealt with fairly and justly.

If we are right about the real relation of these plaintiffs to the commerce and to live stock and to their customers, if they are in any real degree like the men at the far end of the toll bridge, in such a dominant position by reason of their arrangements with the public stockyards and their combination among themselves and their control over the live stock and the commerce, then their business is as clearly affected with a public use as is the business of the carrier that moves the live stock to the pens, or of the stockyard company that receives it into its pens and affords the egress therefrom. If so, it ought to be lawful to subject plaintiffs to regulation, both as to their practices and their charges.

The problem of how to fix a reasonable and just rate, such as the law requires the Secretary to fix, is a very real problem. Here the plaintiffs' function is a stockyards service, but the stockyard owner does not have direct interest in the selling charges. Most public utilities, that have great properties like the stockyards company, use their properties themselves in serving the public. When they do, rate-making bodies are not entirely free to dictate the pay of employees by means of rate fixing. No court declares that utilities can pay out absurd or extraordinary sums, that would amount to a fraud and so cover up an extortion. On the contrary, the law is that extraordinary or unnecessary costs of operation or management cannot be permitted to cover unreasonable or unjust rates.

Of course, if the public stockyards company performed the marketing function itself, its corporate interest would be to keep down the cost of the function. Its honest discretion in compensating its employees for the work would not have to be interfered with. But where the stockyards company turns the facilities over to the marketing agencies, and they combine among themselves to fix their rates, different principles operate.

There is nothing in the evidence to show what considerations have determined the rates, which have been fixed heretofore by the exchange, and which are to be supplanted by the Secretary's schedule of lower rates. It may be assumed, however, that the effort of the exchange has been to fix rates high enough to compensate the efficient, low enough to keep out incompetents, always within the margin of what the traffic would bear, and withal just and reasonable. In view of the fact, however, that the business is affected with a public use, and that it is a necessary part of the interstate commerce in food for the nation, the final arbiter as to whether the charges to be imposed upon the commerce are reasonable or not must be the government, when it chooses to exercise its power, and not the stock exchange. Accordingly it falls to the Secretary, under the Packers and Stockyards Act, to consider what rate is high enough to compensate the efficient, low enough to restrain destructive scrambles for the business among too many agencies, and within the margin of the value of the service to the shippers, and on the whole case to fix reasonable rates, just to all; a most delicate function obviously, but, if necessary, possible.

To that end he must and does have the power to inquire into all of the details of the marketing agencies' business, as it has been and is carried on, and to fix a maximum price, reasonable and proper to be charged. It appears to us from the evidence that the Secretary, through the various steps leading up to his final order, has been guided by proper considerations. He accorded the parties in interest a hearing, and from oral evidence and extensive audits of each and all of the marketing agencies concerned the Secretary undoubtedly had data before him suf-

ficient to build up a rate schedule. He had disclosed to him each and all of the details and items of expense that go to the performance of the function; he found a maximum reasonably chargeable for each detail, and, adding them together, he fixed a maximum charge for the whole service.

There were about 60 agencies operating on the Omaha yards in 1925. Audits of their books and full investigation of the business of each showed such wide variations in the amount of live stock handled by each, in the cost of the service rendered by each, and in the resultant profit or loss to each, as to seemingly cause the Secretary to believe the business was overdone and overmanned, of which there was some testimony, corroborated by the audits; hence he was unable to find from the transactions themselves any common ground of reasonable maximum charges for the services. The highest number of cars of all species handled that year by any one agency was 6,572, and the lowest 250. The exchange had always had a schedule of rates of its own, and was operating under a schedule of its own making during that year. Some of the agencies doing a large business showed profits, and some losses; and some of the agencies doing a small business showed profits, and some losses. This was due, of course, to the expense accounts passed on to the shippers within the limit of the rates.

There was a wide difference in the amounts expended for advertising, traveling solicitors, and entertainment of clients, in the cost of merely selling or buying, which is largely done by employees who are especially competent for that service, and in some firms by the owner or owners, who are likewise competent, but who may or may not serve on a salary basis. According to tabulations made up from the audits for the year 1925, there was no uniformity in these items of cost. No two firms were alike in that respect. The selling cost per car was approximately twice as much for some firms as it was for others, and also for advertising, etc. Generally the selling cost was much less per car for the firms doing a comparatively large business than for those doing less; but as to this there was great variation between firms handling approximately the same number of cars. So with other items of out-of-pocket cost.

Under these conditions, the Secretary declined to adopt averages of actual cost to the different agencies, and set before himself the task of finding the normal and reasonable cost per car of rendering the service for each species, cattle, hogs, and sheep. Then, itemizing the out-of-pocket cost apportioned on a per car basis for each species, he said that in each instance the figure adopted was "a normal of the actual cost of the particular item to those firms whose financial condition exhibits ordinary efficient management in their business." This resulted in his finding that the reasonable cost of handling a car in the year 1925 on the Omaha market of the different species was as follows: Cattle, $13.25; hogs, $9.85; sheep, $13.05.

The petitioners insist that these costs are in each instance too low, that they cannot render the necessary efficient service without expending more, and that there will be no margin of profits in the Secretary's basic rates of $15 per car for cattle, $12 for hogs, and $18 for a double-deck car of sheep. The primary service of the commission firms to the shipper is to sell the live stock on the market at the best price obtainable. Every market agency has its man or men on the market to do that particular job. Many of the men who do the actual selling on the market are owners or part owners of the business, and many are merely hired men. The Secretary was of opinion, from the evidence before him, that $5 a car was the maximum amount that the agencies should be permitted to include in their commission charges on account of this work of actually selling cattle and sheep, and $3 for hogs. The dispute over the action of the Secretary, based on that conclusion, presents the main bone of contention in the whole case.

The plaintiffs say that the per car limit for selling is so low that it is not compensatory, that it is below actual cost, that it is confiscatory, and that it will cause many of them to do business at a loss, and so be driven out of business. There is no uncertainty about how the Secretary came to use the per car limit for selling as a cost item in service in arriving at the rates in his schedule. It was shown to the Secretary that some of the men who do this selling on the market sell a great many cattle, and some sell very few. Some are working for high wages, and some for much lower, and others again, as owners of the business, charge all there is left in the business, after paying expenses, to this selling job performed by themselves.

The Secretary was not concerned with nor attempting to say just what a cattle salesman should be paid. It was his task to find a maximum per car for this work, beyond which anything charged would be unreasonable. To that end he considered how many cars a man could sell in a day, if he had the

cars to sell, and also how many cars the men engaged actually do sell in the course of the business. From the whole the Secretary concluded that good cattle and sheep salesmen were being paid salaries of $5,000, and hog salesmen $4,000, and that any good cattle and sheep salesman can readily sell 1,000 cars of cattle or sheep in a year, if he has that many to sell, any good hog salesman could easily sell 1,333 cars of hogs in a year. There was in fact uncontradicted proof that each could sell many more cars. If he sells more cars per year, as some salesmen do, the Secretary has done nothing to prevent more than $5,000 being paid to the salesman, either as a wage or as a charge against the business, if the salesman is the owner. The Secretary has not acted, then, on any mere theoretical estimation, but on actual experience as disclosed by the evidence. He finds from the evidence before him that the work can be done within the cost he has fixed as a maximum, because it is being done. Indeed, out of 147 salesmen working for wages, only 4 are shown to earn as much as $5,000 a year. Therefore the Secretary's action in arriving at this cost item appears to be within his powers and discretion, and supported by the proof.

It was not incumbent upon the Secretary to fix the rates so high that all agencies in the business would make money, whether they did substantial business or not. The stock exchange itself did not attempt that. No one nor an average of all of the great many different extremes and variants of cost figures could be accepted as a reasonable standard. The audits for 1925 showed that this one item ranged from $4 to $20 per car; the firms with large business having lower costs. So the Secretary, in the exercise of his discretion and judgment, decided that $5 a car for selling cattle and sheep, and $3 per car for selling hogs, was as much as ought to be imposed upon the commerce. We cannot find in the record any grounds upon which the court has any power to set aside that conclusion.

The plaintiffs have caused elaborate audits to be made from the books of the agencies to show that, if each should charge up $5,000 a year on account of the services of each salesman employed or owner salesman in 1925, many agencies would have a balance in red at the end of the year, if the Secretary's schedule should be applied. Arguments are built up on this fact. It is a fact, and a very obvious one, but it in no wise tends to prove that the Secretary's order is oppressive or unjust. Those estimates are made by taking credit for expenses which the Secretary condemned as excessive and unnecessary.

Neither do we find the extensive computation concerning averages to be material. The audits show, and, indeed, it is obvious, that the Secretary did not find a figure of $5 a car for cattle and sheep salesman cost, and $3 for hogs, from any average of the costs to the different agencies. This salesman cost item was very high to some agencies and low to others. To add the two extreme figures together and divide by two, and so reach an average, would be no indication whatever of what a reasonable cost was. No significance can be attached to the many ways in which the auditors have used their computations as to averages.

The shippers and public are entitled under the law to have the charges kept within a reasonable figure, and the Secretary is to judge of that upon evidence. The Secretary having exercised his judgment, the court cannot interfere, except on a showing that the Secretary was wrong. But merely to show that he did not adopt or apply a mathematical mean between two extremes in no way tends to show that he was wrong. On the contrary, the adoption of such a mathematical mean would, as in the case of jury verdicts, suggest gross error on the face of it. The proof does not satisfy, therefore, that the salesman cost item is oppressive or unreasonably low.

The Secretary found a maximum for the other items of costs of carrying on the market agencies in substantially the same way that he arrived at the salesman cost. He refused to be bound by either the lowest cost he found, or by the highest, or by any mathematical average. He found the cost which he deemed normal and reasonable, well below the highest and well above the lowest. As to each item there is proof that some agencies are getting the thing done in actual operation well within the maximum fixed. In each instance there are some agencies that are not keeping within the maximum. Necessarily so. Undoubtedly, if rates were fixed so high that certain profits were assured to all regardless, the agencies would multiply much faster than live stock could be brought to the market, and an endless chain of rate increases would be necessary. It is not the purpose of the regulation to bring this about. The exchange is an unincorporated association composed of the agencies, and we see no reason why reasonable limitations may not be put upon the number of its members.

Outside of specific items, for which he made allowance as necessary parts of the

costs of the market agency service, the Secretary allowed an item of overhead and another of interest; but it is insisted that there are items of bad debts, supervision, use of invested capital, and good will or going concern value, not taken into account by the Secretary. The testimony taken before the master does tend to show that the Secretary was not fully apprised by the plaintiffs at the hearing before the examiner of all overhead cost items that might be taken into account for rate fixing. It does appear that some of the plaintiffs have built up good will of value, but, as the master reports, there are no data to evaluate such items with any certainty. The effect of good will in this business is to bring the live stock to the particular agency which has the good will with less cost for business getting. Such good will enables the firms that have it to do more business with less expense for business getting. I doubt if the fact that some of the agencies have that good will among shippers should compel the uniform rates to be higher than they would be if all the business had to be gotten at high cost. The Secretary made an allowance for business getting which included advertising, etc., as a part of the costs of service, carried in the rate schedule, as were all other costs. We are not convinced this item is too low. The Secretary did not take into account as a separate item the value of all of the exchange memberships of the salesman. He did consider the membership carried on the books of the agencies, but those that were not so carried he did not consider. Neither did he make any separate allowance for bad debts or supervision.

■ It may be that the Secretary was in error on these matters. But in the first place they were not called to his attention at the hearing before his examiner, and in the second place it cannot be said that the rate that has been made up without direct allowance on account of them is in fact going to be confiscatory. In fact the item of expense estimated by the Secretary on an interest basis of 7 per cent. for property used in the business seems to reach a capital asset large enough to include the omitted memberships. Notwithstanding that some agencies have had bad debts, and some have an expense for supervision, it may well be that the rates will work out in practice without oppression or unfairness. In advance of an application of the rates to the test of practice, the court ought not to interfere because there is a mere possibility of inadequate return.

It is hardly to be imagined that every possible cost of every one of the 59 different concerns examined by the Secretary would be specifically referred to and covered in such an order as made by the Secretary. But, where, as in this case, the rate maker has provided a margin and spread for such contingencies, the courts must keep hands off until there has been practical application.

The plaintiffs also claim that the audits of the business of the plaintiff, Tagg Bros. & Moorhead, and the business of R. M. Laverty, show that those concerns would lose money under the Secretary's rates. As to Tagg Bros. & Moorhead, they would, if the condemned excesses in expenses be continued, and the increased rates allowed by the Secretary be disregarded. These increased rates apply only to speculators. It appears that the practice has become established for the plaintiffs to charge a certain class of persons, called speculators or yard traders, half the regular commission which shippers generally have to pay for the same service. The Secretary evidently thinks this discrimination improper, and in his schedule he eliminates it, and authorizes the plaintiffs to charge such traders and speculators the same rate that apply to all others. Both the commission men and the speculators are certain that the whole business of buying for resale on the market will quit, to the detriment of the live stock industry, unless the discriminatory rates are continued; but that is prophecy.

The court has no function where such forecasts of the future clash. Abstractly, speculation appears to be a feature of all open markets everywhere, and might continue at South Omaha, even without discriminatory commission rates in favor of speculators. But the future, and not the courts, must determine. It follows that the showing of probable loss to Tagg Bros. & Moorhead on the hypothesis of half rates to speculators, instead of full rates, as prescribed by the Secretary, is immaterial. A similar audit showing as to the business of R. M. Laverty is equally immaterial.

■ It is also argued by the plaintiffs that on account of the wording of the statute there may be an interpretation that the penalties do not apply to disobedience to the Secretary's rate order. The natural interpretation is to the contrary. It is plain that Congress not only intended to prescribe harsh penalties for any refusal to obey the rate orders of the Secretary, but so stated in the

act with reasonable clarity. Eliminating matter not relevant to this particular question by means of asterisks, the statute says:

Section 305 (7 USCA § 206): "All rates * * * made for any stockyard services furnished at a stockyard by a stockyard owner or market agency shall be just, reasonable, and nondiscriminatory, and any unjust, unreasonable, or discriminatory rate * * * is prohibited and declared to be unlawful."

Section 310 (7 USCA § 211): *"Whenever * * * the Secretary is of the opinion that any rate * * * of a stockyard owner or market agency, for or in connection with the furnishing of stockyard services, is * * * unjust, * * * the Secretary may determine and prescribe what will be the just and reasonable * * * rates * * * and may make an order that such owner or operator shall * * * not thereafter * * * collect any rate * * * for the furnishing of stockyard services other than the rate * * * prescribed. * * *"

Section 301 (7 USCA § 201): "The term 'stockyard services' means services * * * furnished at a stockyard in connection with the * * * buying or selling on a commission basis * * *."

Section 314 (7 USCA § 215): "Any * * * market agency, * * * who knowingly fails to obey any order made under the provisions of section 310 * * * shall forfeit * * * $500 for each offense."

It is clear that the subject-matter of section 310 is the regulation of stockyard services. The reference to "such owner and operator" is to the "stockyard owner" as that term is defined in the statute, including *"any* person engaged in the business of conducting or operating a stockyard," and to the operator of a market agency. Although the powers of the Secretary in question must be clearly and unequivocally conferred, in order to stand up, I think the language of the statute meets the requirement and plainly confers the powers.

On issue joined the plaintiffs applied for a master to take and report the evidence in the case. This was objected to by counsel for defendants. He insisted that an examination of the proof taken by the Secretary's examiner, which was tendered and on which the Secretary made his order, establishing a new schedule of rates, would unquestionably disclose there was substantial evidence before the Secretary taken by the examiner, to sustain the Secretary's order. Interstate Commerce Commission v. Union Pacific Railroad, 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308; Seaboard Air Line Railway Co. v. United States, 254 U. S. 57, 62, 41 S. Ct. 24, 65 L. Ed. 129; United States v. L. & N. R. R., 235 U. S. 314, 321, 35 S. Ct. 113, 59 L. Ed. 245. But it appeared that the order of the Secretary for the hearing before the examiner, served on the respondents there, plaintiffs here, did not advise the respondents of any intention or purpose of the Secretary to fix a new schedule of rates. And it was insisted that the respondents were led to believe from the terms of the order that the only inquiry by the Secretary through his examiner would be whether a schedule of rates known as Tariff No. 2, which the Omaha Stock Exchange had recently theretofore adopted to take the place of a then existing schedule, Tariff No. 1, prescribed excessive rates; and it was insisted that, if the Secretary's inquiry and action was to extend no further than his order and notice indicated it would extend, a finding by him that Tariff No. 2 was excessive would have automatically left Tariff No. 1 in effect, which carries rates higher than those prescribed in the Secretary's order; hence plaintiffs would be deprived of their rights without having been given an opportunity to be heard. And they further said, without contradiction, that at no time during the hearing before the examiner did he give notice of any intention on the part of the Secretary to himself establish a schedule of rates. The Secretary's order for the examiner's hearing recited:

"That on or about the 16th day of January, 1926, the respondents made and published, effective January 26, 1926, and have filed a new schedule of rates and charges designated as Tariff No. 2, for the buying and selling of live stock in commerce at said stockyards, stating new rates and charges, several of which are materially different from and greater than those set forth in their schedules now on file, to all of which schedules reference is herein made for comparison of the rates and charges specified therein; that upon an examination of the records and other information in the possession of the Department of Agriculture the Secretary of Agriculture has reason to believe that the increases proposed by such new schedules are not justified at this time and that such increases are in fact unreasonable. And it therefore appeared that a proceeding under title 3 of the Packers and Stockyards Act 1921 should be had for the purpose of determining the reasonableness and lawfulness of such new rates and charges; and that pending hearing thereof the decision of the Secretary

758

of Agriculture on the operation of said Tariff No. 2 should be suspended and its use deferred."

It was thereupon ordered that said Tariff No. 2 be temporarily suspended and deferred, and "that notice to the above-mentioned respondents is hereby given that a hearing upon the reasonableness and lawfulness of the said schedule of rates and charges will be held before an examiner of the Packers and Stockyards Administration in the courtroom of the United States District Court at Omaha, Nebraska, beginning on the 24th day of February, 1926, at the hour of 10 o'clock a. m., or as soon thereafter as the parties may be heard and continuing from time to time until said hearing is completed. At the above hearing the above-named respondents will have the right to appear and show cause why a further order in respect to the said schedule of rates and charges should not be made by the Secretary of Agriculture in conformity with the provisions of title 3 of the Packers and Stockyards Act 1921." And so on these facts we made the reference, and the master took and reported the testimony offered on behalf of the plaintiffs in their attack on the new schedule of rates made and established by the Secretary to take the place of pre-existing rates.

Some of the plaintiffs testified at length before the master. They themselves had had their books audited by expert accountants. Their audits were in substantial agreement with audits made by expert accountants acting for the Secretary prior to the hearing before the examiner, and were, perhaps, the most substantial proof submitted to the Secretary before he made his order. The accountants for the plaintiffs made up a number of sheets, which disclosed the amount of business done by each agency in 1925, of cost to each for salesmen's services, for salaries, for other help, for advertising, etc.; in fact, the expenses incurred by each firm in conducting its business during the year 1925; also sheets showing the profits and loss to each firm during that year, if the rates prescribed by the Secretary should have been applied. On that basis many of them would have suffered a loss, and but few of them would have made substantial profits. But the outlays for expenses included in those sheets were in many respects items which the Secretary found to be unnecessary in carrying on the business and excessive. These we have considered, with all of the other evidence before the master, as well as the whole record before the examiner offered by plaintiffs, and and we are led to the conclusion from the

facts in the case that the attack on the Secretary's order has not been sustained, that the temporary injunction heretofore issued should be dissolved, and that the bill should be dismissed, at plaintiffs' cost.

It is so ordered.