**ACME, Inc., v. BESSON, U. S. Dist. Atty.**

District Court, D. New Jersey.
March 12, 1935.

Kellogg & Chance, of Jersey City, N. J. (R. R. Chance, of Jersey City, N. J., of counsel), for complainant.

Harlan Besson, U. S. Atty., of Trenton, N. J. (Harlan Besson, of Trenton, N. J., and Mastin G. White, Sp. Asst. to Atty. Gen., of counsel), for defendant.

Meyer Turin, Asst. Counsel, N. R. A., of Washington, D. C.

FAKE, District Judge.

The major issue involved in this suit bears upon the constitutionality of the "National Industrial Recovery Act" approved June 16, 1933 (48 Stat. 195). The cause had been fully presented, oral arguments heard, and briefs submitted, and we were engaged in drafting an opinion in which we were analyzing the cases bearing upon the constitutional limitations placed upon the Congress in attempting to regulate the incidents to manufacture, carried on, of course, wholly within the state. In this posture, Judge Nields, a District Judge in this circuit, handed down his opinion in the case of United States v. Weirton Steel Company, 10 F. Supp. 55 (February 27, 1935), in which the problems within the scope of our inquiry here have been painstakingly and fearlessly considered. His labors in that case have greatly simplified our work and made it unnecessary to hand down our practically completed opinion. Indeed, to do so would be to unnecessarily encumber the reports with repetitious matter.

Whenever an issue is raised as to the constitutionality of an act of Congress, the trial court is called upon to exercise a tremendous power; a power peculiar to our system of government. Whether the conclusions of the court be in the negative or in the affirmative, forces are at once put in motion which may have a far-reaching and all-important effect upon the maintenance of constitutional government. Such power must of necessity exert a sobering influence upon the mind and conscience of the court. It may be well, therefore, in passing, to examine into the nature of the things which must prompt judicial action.

At the outset, it may not be amiss to consider the language of the oath to which the federal jurist subscribes. It requires that he shall "administer justice without respect to persons, and do equal right to the poor and to the rich * * * agreeably to the Constitution and Laws of the United States." It was just such an oath of office as bound Chief Justice Marshall when in Marbury v. Madison, 1 Cranch, 137, at page 177, 2 L. Ed. 60, he said: "Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution is void." The law thus stated is so well founded in logic and so generally understood and accepted in judicial circles that it needs no emphasis here.

Again it may be of value to review briefly the thought of some of the illustrious scholars and statesmen who have written and spoken on the subject.

After a critical examination of our institutions, including a careful analysis of the constitutional limitations of our courts, the learned De Tocqueville said on the subject: "Within these limits, the power vested in American Courts of Justice of pronouncing a statute to be unconstitutional, forms one of the most powerful barriers which have ever been devised against the tyranny of political assemblies."

During the Lincoln-Douglas debates, this power of the United States Supreme Court was dealt with by both parties. Mr. Lincoln said: "We think its decisions on constitutional questions, when fully settled, should control not only the particular cases decided, but the general policy of the country, subject to be disturbed only by amendments to the constitution as provided in that instrument itself. More than this would be revolution."

Senator Douglas had this to say: "The courts are the tribunals prescribed by the constitution and created by the authority of the people to determine, expound, and enforce the law. Hence, whoever resists the final decision of the highest judicial tribunal aims a deadly blow at our whole republican system of government—a blow

which, if successful, would place all our rights and liberties at the mercy of passion, anarchy, and violence."

The great British Ambassador, Hon. James Bryce, in his work, "The American Commonwealth," refers to this power of the courts in the following words: "It is nevertheless true that there is no part of the American system which reflects more credit on its authors or has worked better in practice. It has had the advantage of relegating questions not only intricate and delicate, but peculiarly liable to excite political passions, to the cool, dry atmosphere of judicial determination." And further: "By leaving constitutional questions to be settled by the courts of law another advantage was incidently secured. The court does not go to meet the question; it waits for the question to come to it. When the court acts, it acts at the instance of a party. Sometimes the plaintiff or the defendant may be the National government, or a State government, but far more frequently both are private persons, seeking to enforce or defend their private rights." Again, to quote the same author: "The Supreme Court is the living voice of the Constitution—that is, of the will of the people expressed in the fundamental law they have enacted. It is, therefore, as some one has said, the conscience of the people, who have resolved to restrain themselves from hasty or unjust action by placing their representatives under the restriction of a permanent law. It is the guarantee of the minority, who, when threatened by the impatient vehemence of a majority, can appeal to this permanent law, finding the interpreter and enforcer thereof in a court set high above the assaults of faction."

Mr. Woodrow Wilson, in his book entitled "Constitutional Government in the United States," had the following to say: "Our courts are the balance-wheel of our whole constitutional system; and ours is the only constitutional system so balanced and controlled. Other constitutional systems lack complete poise and certainty of operation because they lack the support and interpretation of authoritative, undisputable courts of law. It is clear beyond all need of exposition that for the definite maintenance of constitutional understandings it is indispensable, alike for the preservation of the liberty of the individual and for the preservation of the integrity of the powers of the government, that there should be some non-political forum in which those understandings can be impartially debated and determined. That forum our courts supply. There the individual may assert his rights; there the government must accept definition of its authority. There the individual may challenge the legality of governmental action and have it judged by the test of fundamental principles, and that test the government must abide; there the government can check the too aggressive self-assertion of the individual and establish its power upon lines which all can comprehend and heed. The constitutional powers of the courts constitute the ultimate safeguard alike of individual privilege and of governmental prerogative. It is in this sense that our judiciary is the balance-wheel of our entire system; it is meant to maintain that nice adjustment between individual rights and governmental powers which constitutes political liberty."

While this power of the courts has been debated from time to time, never in our history has it been successfully attacked. So much then for the nature and the propriety of the exercise of the power of the courts to interpret and enforce the Constitution.

Seldom, however, is the trial court left entirely alone with the Constitution and the statute before it. It has resort to the doctrine of stare decisis and may apply it following the decisions of the United States Supreme Court and the Circuit Court of Appeals. It is also proper, where the higher courts have not specifically passed upon a point, to consider such obiter dicta as may be found in their opinions, to the end that its logic may be considered and perhaps point the intent of the higher courts.

In the light of the foregoing, the solution of the problems raised in the instant case are to be considered.

The plaintiff herein seeks an injunction to restrain the defendant, Mr. Harlan Besson, United States Attorney for this district, from instituting or prosecuting any proceeding against the plaintiff for any alleged violation of the National Industrial Recovery Act or the Code of Fair Competition for the Fabricated Metal Products Manufacturing and Metal Finishing and Metal Coating Industry.

The National Industrial Recovery Act will be hereinafter referred to as the Recovery Act, and the Code of Fair Competition for the Fabricated Metal Products Manufacturing and Metal Finishing and

Metal Coating Industry, for brevity, will be referred to as the code.

The answer admits the necessary jurisdictional requirements. The cause was heard on final hearing, hence no question of temporary stay or preliminary injunction is raised, and the court proceeds upon the pertinent facts, which, pursuant to Equity Rule 70½ (28 USCA § 723), are stated as follows:

The plaintiff is a New Jersey corporation engaged in the business of manufacturing wire forms, handles, staples, paper clips, and other objects of commerce at its factory in the city of Jersey City in the state of New Jersey, where the operations of manufacture are fully completed. When so completed, plaintiff's products are sold generally throughout the United States and Canada.

The nature of plaintiff's business is such as to bring it within the definition of industries intended to be governed by the language of the Recovery Act and the particular code bearing upon that industry adopted pursuant to the act.

The plaintiff violates and has not and does not now obey the mandatory provisions of the Recovery Act and its accompanying code in the matter of the payment of wages, or in the requirements relating to hours of labor, or in the matter of furnishing reports relating to its operations. The plaintiff has not paid and refuses to pay its proportionate share of the expenses incident to the maintenance of the Code Authority as required by paragraph 7, article IV of the Code, as amended, notwithstanding that the code expressly provides that "each member of the Industry" is required so to do, and "member of the Industry" is defined as "anyone engaged in the Industry." Plaintiff is so engaged.

Plaintiff did not participate in the negotiations which led to the promulgation of the mutual agreement or Code of Fair Competition which, upon subsequent approval by the Chief Executive, purports to be the law of the land and to subject plaintiff to its penalties for noncompliance.

The Code Authority by its chairman, H. S. Kimball, notified plaintiff, in writing, that its name appeared in the "citation list * * * required to be filed with N. R. A. for non-compliance with our Basic Code, * * *" and stated in said notice that, "unless we receive an immediate reply from you effecting complete compliance or showing justification for failure to comply," the plaintiff's name would be filed "with N. R. A. for non-compliance." This notice is rather lengthy. The gist of it is an allegation that plaintiff has failed to pay the "mandatory Code Authority assessment," and has failed to file statistics requested in the Code Authority's form 9. This form is provided for a "confidential report on wages and hours of employment covering the pay period nearest June 15, 1934," hence the threat to file the plaintiff's name with "N. R. A.," as above stated. Plaintiff has ignored the aforesaid notice, and has not filed the statistical data demanded.

Since the effective date of the code, one Jube, a "Field Adjuster" representing the Code Authority, called upon plaintiff and asked for a certified copy of plaintiff's pay roll, and upon plaintiff's refusal to comply with this request Jube said he would report such fact to the National Recovery Administration, and informed plaintiff that said body might report the matter further to the United States District Attorney for the District of New Jersey for prosecution under the Recovery Act.

A circular issued by the Attorney General, No. 2614, expressly requires that, before any proceeding either civil or criminal shall be instituted by the District Attorney for the enforcement of the Recovery Act, authority shall first be obtained from the Attorney General or the Director of Litigation of the National Recovery Administration or a State N. R. A. Director of Compliance. None of these officials has authorized enforcement proceedings by the District Attorney against this plaintiff, and he does not intend so to proceed until he receives the authority required by the circular.

Upon the foregoing facts it is argued that the plaintiff has a full, complete, and adequate remedy at law wherein it may defend itself in the event of prosecution, and there being no imminence of prosecution, and the plaintiff being in no immediate danger of damage to its property rights, a bill for injunctive relief will not lie.

Section 3 (f) of title 1 of the National Industrial Recovery Act (15 USCA § 703 (f), reads as follows: "When a code of fair competition has been approved or prescribed by the President under this title [chapter], any violation of any provision thereof in any transaction in or affecting interstate or foreign commerce shall be a misdemeanor and upon conviction thereof an offender shall be fined not more than

$500 for each offense, and each day such violation continues shall be deemed a separate offense."

It should be noted that neither the foregoing language nor the language of any other part of the act vests express authority in the Attorney General to refrain from prosecuting violators thereof, and while it is undoubtedly true that the Attorney General must of necessity exercise some degree of authority over the District Attorneys in the respective districts, it cannot reasonably be contended that his powers are so vast as to permit him to refrain from authorizing prosecution in due course, when clear and unequivocal evidence of violation as appears here is brought to his attention. To view it otherwise would be to establish government by a single man as distinguished from government by law. Nor can it be said that the doors of the grand jury room are closed until opened by authority of the Attorney General for violations of the Recovery Act. That this view of his authority is taken by the Attorney General himself may be evidenced by the absence of any affidavit or testimony from him in this cause to the effect that he does not intend to authorize prosecution of this plaintiff upon its admissions in the complaint.

It therefore must be found that there is nothing in the Recovery Act, nothing in circular No. 2614, and nothing in the affidavit or testimony of the defendant upon which the plaintiff may rest in full assurance that its violations of the act do not place it in jeopardy of imminent prosecution. Indeed, upon knowledge of violation a duty immediately devolved upon the law enforcement authorities to institute proceedings for such violations. We are not without evidence, however, of an intent to prosecute this plaintiff, which further dissipates the thought that it is secure against prosecution. This is found in the written notice above referred to and in the testimony of the activities of Jube, the "Field Adjuster," from which it must be concluded that steps were being taken by officials directed to but one end, and that, the preparation of a case against the plaintiff.

In passing upon the sufficiency of the complaint, we must consider also whether plaintiff's property rights are in jeopardy. The rule as laid down in Hygrade Provision Co. v. Sherman, 266 U. S. 497, at page 500, 45 S. Ct. 141, 142, 69 L. Ed. 402, is: "A court of equity will interfere to prevent criminal prosecutions under an unconstitutional statute when that is necessary to effectually protect property rights." And in dealing with a similar penalty clause in Panama Refining Co. v. Ryan et al., 55 S. Ct. 241, 246, 79 L. Ed. —, filed January 7, 1935, Mr. Chief Justice Hughes said: "We think that these penalties would attach to each violation, and in this view the plaintiffs were entitled to invoke the equitable jurisdiction to restrain enforcement, if the statute and the executive orders were found to be invalid." So we must find here that the penalty clause under review, inflicting daily recurring penalties as it does, tends to injuriously affect plaintiff in its property rights, and the suit will lie to test the constitutionality of the act. Thus the aggrieved citizen is not left without a remedy, nor is the door of the court closed when his rights should be expeditiously considered and defined.

This case is distinguished from Sparks v. Mellwood Dairy, 74 F.(2d) 695, decided by the Circuit Court of Appeals for the Sixth Circuit, December 14, 1934, in that here, findings of fact are made, while in the Sparks Case it is asserted they were not.

The motion to dismiss the complaint herein is denied.

We will now turn to the constitutional questions raised by the facts and the pleadings. It is urged for the plaintiff that title 1 of the Recovery Act and the code (15 USCA § 701 et seq.) mentioned in the complaint are unconstitutional and void, in that they are repugnant to the Ninth and Tenth Amendments to the Constitution of the United States. Turning to the Recovery Act, we find that section 1 thereof (15 USCA § 701) recites the existence of a national emergency resulting in the disorganization of industry and other evils. The policy of Congress is declared to be the removal of obstructions "to the free flow of interstate and foreign commerce * * * and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision," and "to eliminate unfair competitive practices, * * * " as by reference thereto will more fully appear. This section is also dealt with in Panama Refining Co. v. Ryan, supra, in the following

language: "It is manifest that this broad outline is simply an introduction of the act, leaving the legislative policy as to particular subjects to be declared and defined, if at all, by the subsequent sections."

Our problem here concerns manufacture and the incident activities which lead to the completion of manufactured articles. A reading of the Recovery Act and the related code discloses that the intent of the legislation is to govern, regulate, and control the internal management of plaintiff's factory in the matter of wages and hours of labor, if it engages in "any transaction in or affecting interstate or foreign commerce." There can be no doubt but that in the broader meaning of the word "affect," this plaintiff, in fabricating articles of commerce, produces commodities which eventually find their way into the stream of interstate commerce, and must therefore necessarily "affect" such commerce to the extent that they so move. It should be noted, however, that the commerce clause of the Constitution does not contain the word "affect." It is significant that it occurs in the Recovery Act only. The power granted to the Congress by article 1, § 8, cl. 3, is limited to the regulation of commerce as such, and further limited to commerce between states. But what is commerce, and wherein does it differ from manufacture? Judge Nields has answered this question by resort to definitions laid down by the United States Supreme Court; the same source to which we had referred in our research. In Kidd v. Pearson, 128 U. S. 1 at page 20, 9 S. Ct. 6, 10, 32 L. Ed. 346, we find it defined in these words: "Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce. * * *" Here, then, is the definition which must guide us, not only because of its authoritative source, but because of its innate and inescapable logic. There is still another source to which we may refer in sustaining the foregoing definition, and that is the well-known historic fact that the people of the original states were extremely reluctant in granting powers to the federal government and expressly laid down a rule of constitutional construction in the Ninth Amendment, wherein our forefathers said: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." And then, further, in the Tenth Amendment, we find this express limitation upon the federal government: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." In view of the foregoing, we have labored in vain to conclude that it was the intent of the Constitution to pass to the Congress regulatory authority over those local, intimate, and close relationships of persons and property which arise in the processes of manufacture, even though they may, in the broader sense, affect interstate commerce.

If they exist at all, the powers and authority attempted under the Recovery Act in relation to contracts of employment in manufacture come within the police power of the several states. As such, they are expressly reserved to the states or the people under the Tenth Amendment. To hold otherwise would be to destroy that peculiar union of sovereign states which the Constitution contemplates shall endure unless, and until perchance, an amendment may revolutionize the relation which the federal government now bears to the several states and their people.

There can be no doubt but that the framers of the Constitution and the people who adopted it intended that it should operate, not only for themselves, but for posterity as well, as a foundation or basic structure upon which subsequent legislation must find support. It was intended to be a rigid thing. Any legislative superstructure which might be attempted would rest on that foundation or fall of its own weight. At the same time they recognized that, in an ever changing world, the very rigidity of many of its provisions and the limitations placed upon the exercise of implied powers might in the future prove it to be inadequate, so they wisely provided means for its amendment, but even here, so thoughtful were they, that amendments are made impossible except upon mature deliberation in the intervening time required before the people can be called upon to express their will. It should be remembered that the Federal Constitution was adopted for the long pull, not to be discarded in emergencies, however serious, but rather to be kept intact and amended as necessity might prompt.

The Recovery Act and the incident code, in so far as they attempt to regulate

the hours of labor, the fixing of wages, or the furnishing of so-called confidential reports thereon, are without sanction under the Constitution and, therefore, void. In arriving at this conclusion we do not stand alone. See the exhaustive opinion of Judge Dawson in Hart Coal Corp. v. Sparks (D. C.) 7 F. Supp. 16, wherein the prior cases in the United States Supreme Court are collected and logically considered. See, also, the opinion of Judge Nields in the Weirton Case, supra, wherein he differentiates the cases of Swift & Co. v. U. S., 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, Stafford et al. v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, and Board of Trade of City of Chicago v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, from a case wherein manufacture is dealt with as it is here.

The requirement that this plaintiff pay its "equitable contribution" toward the maintenance of the Code Authority requires an examination into the sources from whence that Authority derives its powers. It is defined in the code as the Executive Committee of the Federation, operating under the code, and is charged with the administration of the code under the Administrator.

The expenses which the Code Authority may incur are not expressly limited by the code, except that they shall be such as may reasonably arise in the administration of matters and things which pertain to fair competition established by the terms of the code and "to effectuate the policy of the Act." Here, there is room for much speculation as to the nature of the tax which is thus levied, and as to what the policy above referred to may be. We will not, however, go into these factors at this time, since they open up subjects which are not necessary for present purposes.

We have noted that the Code Authority finds its prerogatives in the Code, and this leads us to that document for further consideration. Here, we find a set of rules and regulations governing all who may be engaged in the businesses which the code definition purports to cover, whether they consented to be so governed or not. Can this be possible under our system of constitutional government?

The Recovery Act provides that industrial groups made up of individuals, holding no official position under the government and under no oath of office, may assemble and initiate legislation having binding effect upon all, providing the codes thus evolved do not (1) "impose unequitable restrictions on admission to membership therein and are truly representative of such trades or industries, * * *" and (2) "* * * are not designed to promote monopolies or to eliminate or oppress small enterprises and will not operate to discriminate against them, and will tend to effectuate the policy of this title," and receive executive approval (section 3 (a) of the act, 15 USCA § 703 (a). There are other provisos or limitations, but they are not material for present purposes. Our purpose here is merely to outline the procedure. Here, then, we find a system for the initiation of legislation recognized by law, wherein the voice of the majority of those directly financially interested dictates a code or body of laws to become binding directly upon the parties defined therein, and indirectly upon the entire populace whether they assent thereto or not, and whether they be directly interested financially therein or not. Under it, our population is divided into industrial classes with no representation required for outsiders unless it be the President or his representatives. The speed with which such codes became the law of the land has placed a burden upon the Chief Executive and his officers, transcending anything of the kind ever heretofore attempted. The Executive Department was called upon to review all things and know all things in the myriad ramifications of our entire complex economic system before intelligent approval could be exercised.

Can it be that such is what the framers of the Constitution intended might ensue when they said in article 1, § 1, of the Constitution: "All legislative Powers herein granted shall be vested in a Congress of the United States? * * *" True, under this section the courts have heretofore approved limited and closely defined delegations of legislative power, but never, we think, to such a broad extent as to include the entire province of federal and state power over industry, trade, commerce, and the other "steps of the economic process" as here attempted.

Since practically all constructive legislation either affects one's liberty or his property, and ofttimes both, it was intended under our constitutional system that legislative enactments would not be inflicted upon our people save only in the orderly procedure of parliamentary action through

two houses, a procedure contemplating action in the open, under public scrutiny, subject to public discussion and public hearings. Not a system under which thousands of hearings, in divers places of congregation, might at one time be held without fair and adequate notice, whenever self-interest might prompt an organized effort at codified prohibitions. Under the latter procedure, the humble citizen is hopelessly overwhelmed and never effectively represented. Such government savors much of special privilege. It cannot be recognized as that representative form of government which the Constitution authorizes. It may be urged that such gatherings were informal and of such nature as always to be permissible, and their action is merely advisory to the Chief Executive. This may be partly true, but only partly so, since the Recovery Act expressly authorizes and recognizes such gatherings, furnishes them with government assistants from the Executive Department, and clothes them with a dignity and a power which the Sherman Anti-Trust Act (15 USCA § 1 et seq.) and the law relating to monopolies never would have countenanced.

Such a system as that contemplated under the Recovery Act, when added to the congressional power to initiate and enact legislation, furnishes us at once with two separate and distinct governments to be supported by our people within the federal system. The one under the authorized constitutional or civic system, and the other through the economic code and code authority system, the latter requiring a new and novel bureaucratic or institutional organization for its enforcement, in which the liberties and the property of our citizens may be all too lightly dealt with on the theory of a specially privileged democracy in the sphere of economics. It is by such devious methods and artful devices that the freedom and property of our people, which are safeguarded by the Bill of Rights, may be placed in jeopardy.

In Hampton, Jr., & Co. v. U. S., 276 U. S. 394 at page 406, 48 S. Ct. 348, 351, 72 L. Ed. 624, the late Mr. Chief Justice Taft, in dealing with a question as to the lawful delegation of legislative power, said: "It is a breach of the national fundamental law if Congress gives up its legislative power and transfers it to the President. * * *" In this same opinion he cites the rule announced in Cincinnati, Wilmington & Zanesville Railroad Co. v. Commissioners, 1 Ohio St. 77, 88, as follows: "The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

With this rule in mind we turn to the Recovery Act and find that by its terms in section 2 (a), 15 USCA § 702 (a), the President, "To effectuate the policy of this title [chapter]" (which title has been held ineffective in Panama Refining Co. v. Ryan, supra), is "authorized to * * * accept and utilize" the services of individuals and agencies "as he may find necessary." This places no limitation whatever upon the Executive. In the same section in paragraph (b), 15 USCA § 702 (b), we find that the President "may establish an industrial planning and research agency to aid in carrying out his functions under this title [chapter]." Here, it should be noted there is no compulsion about the matter. Hence, it affords no limitation, sets up no fact finding body, and leaves the Executive free. Again, in paragraph (c) of section 6 (15 USCA § 706 (c), we find that: "Upon the request of the President, the Federal Trade Commission shall make such investigations as may be necessary * * * to carry out the provisions of this title [chapter]. * * *" Here, there is no requirement that the Trade Commission must be resorted to, and again the Executive is left free to act.

In Hampton, Jr., & Co. v. U. S., supra, it was found that the President's power to increase and decrease duties was not intended to be absolute under the act then under consideration; that the Congress had defined its intent, in providing that investigations be made by the Tariff Commission, and contained the following limitation: "No proclamation shall be issued under this section until such investigation shall have been made." We find no such limitation in the Recovery Act.

Referring now to section 3, par. (a) of the Recovery Act (15 USCA § 703 (a), we note that: "The President may, as a condition of his approval of any such code, impose such conditions (including requirements for the making of reports and the keeping of accounts) for the protection of consumers, competitors, employees, and others, and in furtherance of the public inter-

est, and may provide such exceptions to and exemptions from the provisions of such code, as the President in his discretion deems necessary to effectuate the policy herein declared."

Then, in section 10 (b) of the act (15 USCA § 710 (b), we find the following: "The President may from time to time cancel or modify any order, approval, license, rule, or regulation issued under this title [chapter]; and each agreement, code of fair competition, or license approved, prescribed, or issued under this title [chapter] shall contain an express provision to that effect."

Certainly, no reasonable limitations and no sufficient definitions of power are found in the foregoing language. It is all very broad and general. The declaration of policy set out in section 1 (15 USCA § 701) cannot aid us. Its reiteration here gives it no greater force than standing alone.

We can arrive at no other conclusion than that the Recovery Act is unconstitutional because it attempts an unlawful delegation of legislative authority.

A decree will be entered in conformity herewith.